## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

**FAITH ALUMINUM COMPANY,**

    **Plaintiff,**

**v.**                                    **Civil Action No. 4:24-cv-00151-WMR**

**CONSTELLIUM ROLLED
PRODUCTS RAVENSWOOD, LLC,**

    **Defendant.**

## BRIEF IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Having been paid in full for all the scrap aluminum processing that Faith

Aluminum Company ("Faith") performed for Constellium Rolled Products

Ravenswood, LLC ("Constellium"), Faith seeks to be paid for processing it did ***not***

perform. Faith, however, has no evidence of a contract obligating Constellium to pay

more than a million dollars for no work in return. All evidence points the other way.

Constellium would, and did, pay for scrap aluminum processing that Faith

performed and nothing more. No contract states otherwise. Indeed, Faith's owner

now declares, "[Constellium] never signed a contract [with Faith] period." Worse

yet, Faith shut down its plant after January 2024 and sold its production equipment.

Faith could not perform the purported 2024 contract it now seeks to enforce against

1

Constellium. Accordingly, Constellium is entitled to summary judgment on Faith's claims seeking money for nothing.

## I. ARGUMENT

### A. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The substantive law" applicable to the case—here, Georgia's contract law—"identif[ies] which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B. Faith Processed Scrap Aluminum for Constellium, and Constellium Paid for the Processing.

#### 1. Faith added poly 5052 de-coating as a new business in May 2023.

Steve Stewart ("Mr. Stewart") and his wife, Muriel Stewart ("Mrs. Stewart" and collectively with Mr. Stewart, the "Stewarts"), formed Faith after they sold a scrap yard business in 2019. (Dep. Tr. of Muriel Stewart at 17:23–18:6 (April 28, 2025), **Exhibit 3**[1] [hereinafter "M. Stewart Tr."]). Faith began operations at its Rockmart, Georgia plant in late 2020. (Dep. Tr. of Steve Stewart, Vol. 1 at 30:18–22 (April 28, 2025), **Exhibit 4** [hereinafter "S. Stewart Tr., Vol. 1"]). Faith had a "buy-sell" business model in which it would buy scrap aluminum, process the scrap,

---

[1] Exhibit numbers in this brief refer to exhibits as numbered in and attached to the contemporaneously filed Defendant's Statement of Undisputed Material Facts.

and sell the recycled product, "3X aluminum alloy," as a feedstock to aluminum mills and extrusion plants. (Ex. 4, S. Stewart Tr., Vol. 1 at 30:18–31:13; Dep. Tr. of Steve Stewart, Vol. 2 at 148:22–23 (April 29, 2025), **Exhibit 5** [hereinafter "S. Stewart Tr., Vol. 2"]).

In early 2023, however, the market price for Faith's 3X product fell to the point that Faith "couldn't make money on it." (Ex. 4, S. Stewart Tr., Vol. 1 at 32:18–23). Faith made the decision to add a new line of business of removing the plastic or "poly" coating from poly 5052 scrap aluminum to produce a recycled 5052 aluminum feedstock.[2] (Ex. 4, S. Stewart Tr., Vol. 1 at 33:17–22; Ex. 5, S. Stewart Tr., Vol. 2 at 135:23–136:2). For its new business, Faith added a "rasper" to its production line, and through trial runs, Faith developed its process to remove the coating from the poly 5052 aluminum scrap. (Ex. 4, S. Stewart Tr., Vol. 1 at 33:23–34:18; *see also* Email from G. Rittenhouse to S. McCord, at RITT_008305 (Oct. 17, 2023) (RITT_008305–308), **Exhibit 6** [hereinafter "Oct. 17, 2023 Email"]).

### 2.  Constellium became Faith's customer for poly 5052 de-coating.

Constellium's Ravenswood, West Virginia, plant is one of two aluminum manufacturing plants located in the United States that are affiliated with a Constellium entity headquartered in France. (Dep. Tr. of Shawn George at 18:4–24

---

[2] Mr. Stewart made the operational decisions for Faith. (Ex. 4, S. Stewart Tr., Vol. 1 at 20:20–22; Ex. 3, M. Stewart Tr. at 25:2 ("Steve always had the final say.")). Mr. Stewart signed all contracts for Faith. (Ex. 4, S. Stewart Tr., Vol. 1 at 20:23–24).

(April 1, 2025), **Exhibit 1** [hereinafter "S. George Tr."]). Since 2022, Shawn George has been the Metal Champion for Constellium with the primary responsibility of buying scrap aluminum to support the production of aluminum alloys at the Ravenswood plant. (*Id.* at 15:19–23, 17:9–13). On April 24, 2023, Mr. Rittenhouse, using his Regional Metal Services signature block, sent Mr. George an email offering to sell Faith's 3X product to Constellium. (Email String between G. Rittenhouse and S. George, at CRPR-000005–6 (4/24/2023–5/4/2023), **Exhibit 13**; *see* Ex. 1, S. George Tr. at 42:14–43:12 (discussing email)).

On May 9, 2023, Mr. Rittenhouse again wrote to Mr. George regarding the capabilities and capacities of Faith's plant, focusing on offering Constellium a 3X product. (Email from G. Rittenhouse to S. George, at RITT_012841 (May 9, 2023), **Exhibit 7** [hereinafter "May 9, 2023 Email"]). The May 9, 2023 Email also introduced Mr. George to Faith's "newest production activity for the plant," de-coating "5052 coated materials (poly, pvc, paint)" and producing a feedstock for aluminum mills. (*Id.*). The email stated that "the larger portion of [Faith's] plant's production [still was] targeted at providing a consistent [3X] feedstock." (*Id.*). "Production capacity for [the poly 5052 de-coating] segment of [Faith's] activity [was] targeted at 1.0mm pounds per month [to] be allocated to a single mill customer." (*Id.* at RITT_012841–42). The email said Faith would schedule the 5052 de-coating work "to occur once per month so [it could] balance total production and

meet the needs of [its] mill customers as [it] shift[ed] between production alloy schedules." (*Id.* at RITT_012842).

Also in May 2023, Goldy Metals, a metals broker, provided some of the results of Faith's trial runs of "5052 shreds" to Constellium, through Mr. George. (*See* Ex. 1, S. George Tr. at 34:17–36:25, 38:2–7). At about the same time, Mr. George learned that another metals broker, United Scrap Metal ("United"), had accumulated a large amount of poly 5052 scrap from a truck body manufacturer, Morgan-Olson, for which United did not have a buyer. (*Id.* at 36:25–37:6). Mr. George was able to work a deal to purchase the poly 5052 scrap from United, which would ship the scrap directly to Faith's plant for processing or "tolling." (*Id.* at 37:7–13).

On May 19, 2023, Mr. Rittenhouse sent Mr. George an email with Faith's "tolling rates for the 5052 scraps from Morgan-Olson." (Email from G. Rittenhouse to S. George, at RITT_012844 – 45 (May 19, 2023), **Exhibit 14** [hereinafter "May 19, 2023 Email"]). The email proposed a two-tier rate structure of $0.19 per pound for 700,000 to 1 million pounds and $0.16 per pound for all pounds over 1 million in a month, and the email stated "[m]inumum monthly toll volume 700,000 lbs." (*Id.*). For Constellium to obtain these rates, Faith sought a "ten (10) month tolling contract between Faith Aluminum and Constellium." (*Id.*). Mr. Rittenhouse's May 19, 2023 email was an offer to contract, but the parties did not agree upon those

terms. (Faith's Ans. to R.F.A. No. 9, Pl. Faith Aluminum Co.'s Objs. & Resps. to Def.'s First Discovery, at 32–33 (Oct. 11, 2024), **Exhibit 15** [hereinafter "Faith's Discovery Responses"]). "[T]he parties ultimately agreed on a rate of $0.18/pound in 2023."[3] (*Id.* at 33).

### 3. Faith tolled poly 5052 scrap for Constellium from June 2023 to January 2024, and Constellium paid for that tolling.

Faith began tolling poly 5052 scrap for Constellium in June 2023, and Faith sent weekly invoices for the scrap that it processed with matching inventory reports. (Dep. Tr. of Kim Watson at 34:19–35:20 (April 28, 2025), **Exhibit 11** [hereinafter "K. Watson Tr."]); Email from K. Watson to H. Gray, FAC_0005011 (June 19, 2023), **Exhibit 17**). Faith began the work without a written contract in place. Also, Constellium did not provide Faith with a copy of a purchase order in 2023, and instead, Constellium provided Faith with only the sequential purchase order number from Constellium's internal records that Faith was to use on its invoices. (Ex. 11, K. Watson Tr. at 49:12–25; Ex. 1, S. George Tr. at 74:25–76:8, 76:19–77:8).

Although Constellium began planning in June 2023 to propose a contract to Faith, by September, Constellium had determined to use only its internal purchase order for 2023 and not propose a contract. (Dep. Tr. of Jennifer Fife at 35:17–42:14

---

[3] Although Faith invoiced at the $0.18 per pound rate in 2023, and Constellium paid that rate, no document memorializes the parties' specific agreement to the rate. (*See* Ex. 4, S. Stewart Tr., Vol. 1 at 62:16–22 (stating that Constellium eventually "argued [the per-pound rate] down to $0.18 and $0.15" some time after May 2023)).

(April 2, 2025), **Exhibit 2**; Ex. 1, S. George Tr. at 83:6–88:22). Faith's invoices and inventory reports had to match exactly, and Faith corrected any inaccuracies identified by Constellium. (Ex. 11, K. Watson Tr. at 35:21–36:2). Faith invoiced Constellium for the specific amounts of poly 5052 scrap that Faith processed.[4] (Ex. 11, K. Watson Tr. at 36:16–24). Constellium paid Faith all amounts that Faith invoiced in 2023. (Ex. 15, Faith's Ans. to R.F.A. No. 11, Faith's Discovery Responses at 34). Faith's invoices and the associated inventory reports are the only documentation of Faith's work for Constellium in 2023 that the parties exchanged.

On January 9, 2024, Mr. George sent Mr. Rittenhouse a purchase order for the first four months of 2024 and stated in the transmittal email that he still was working on a formal contract for 2024. (Email from S. George to G. Rittenhouse with attached Purchase Order (Jan. 9, 2024), Ex. B to Compl., at 17 & 18 of 21, **Exhibit 20**). The January 9, 2024 purchase order is a request for tolling services with a quantity term and a price term. (*Id.* at 20 & 21 of 21, Purchase Order). The purchase order required Faith to accept it by returning a signed acknowledgement, but Faith did not sign or

---

[4] On September 25, 2023, Constellium asked Faith for a "open items/month-end statement for any/all outstanding invoices for Faith Aluminum" to "help ensure [Constellium] capture[s] everything owed each month." (Email from A. Lucas to K. Watson, FAC_003356–57 (Sept. 25, 2023), **Exhibit 18**; Ex. 11, K. Watson Tr. at 37:6–24). Faith then provided month-end reports to Constellium for September through December 2023 that listed the dollar amounts of unpaid invoices, originally issued for the specific poundage that Faith processed. (Ex. 11, K. Watson Tr. at 38:9–41:6).

accept the purchase order. (Ex. 5, S. Stewart Tr., Vol. 2 at 114:19–115:20 (stating that Faith did not sign the purchase order because Constellium had not proposed a formal contract and "we were still negotiating")). Nonetheless, Faith tolled poly 5052 scrap for Constellium in January, and Constellium ultimately paid Faith for that processing. (Ex. 5, S. Stewart Tr., Vol. 2 at 115:7–116:5).

On January 29, 2024, Faith emailed a letter to Constellium demanding that Constellium pay weekly invoices for 250,000 pounds of tolling, even though Faith had not performed the tolling. (Letter from S. Stewart to Constellium, CRPR-007191–200 (Jan. 29, 2024), **Exhibit 22** [hereinafter "January 29, 2024 Letter"]; *see* Ex. 5, S. Stewart Tr., Vol. 2 at 126:7–128:14 (discussing letter)). Faith demanded that Constellium agree by noon on January 29 to "pay all invoices as submitted for January," or Faith would "halt[] all further shipments into our facility." (Ex. 22, January 29, 2024 Letter at CRPR-007191). Mr. Stewart sent the January 29 letter to "pull[] the plug here" because in his opinion, Constellium had no intention of honoring what Mr. Stewart considered to be its obligations. (Ex. 5, S. Stewart Tr., Vol. 2 at 129:16–21). On February 15, 2024, Faith emailed Constellium that it must pick up its remaining inventory at Faith within a week. (Email from K. Watson to S. George, *et al.*, FAC_0008587 (Feb. 15, 2024), attached as **Exhibit 23**). Faith's February 15 email confirms that Faith intended to stop doing business with Constellium. (Ex. 5, S. Stewart Tr., Vol. 2 at 130:9–131:9).

**C. Faith Closed Down after January 2024 and Sold Its Equipment.**

The Stewarts apparently began Faith in 2019 as an entrepreneurial venture, hoping to sell the plant after it was up and running. "Off and on we had that plant up for sale many times," according to Mr. Stewart. (Ex. 5, S. Stewart Tr., Vol. 2 at 154:15–19). One of those times was 2023, when Faith had interest from a company in Alabama that it began talking with early in the year, (*id.* at 153:12–154:1), but by mid-October 2023, the potential buyer "was stalling a bit given the slow[-]down in demand for flat rolled aluminum products," so the sale did not occur at that time, (Ex. 6, Oct. 17, 2023 Email at RITT_008305). Beginning on February 2, 2024, Faith again offered its assets for sale. (*See* Email from G. Rittenhouse to B. Halloran (Feb. 2, 2024) (RITT_011927–28), **Exhibit 8**, attaching Specialty Scrap Aluminum Processor Sale Presentation (RITT_011929–37), **Exhibit 9** [hereinafter "2024 Sale Presentation"]). In its February 2024 sale materials, Faith told potential buyers that "[t]he Seller wishes to retire and fully relocate residence after thirty years in scrap metals industry." (Ex. 9, 2024 Sale Presentation, at RITT_011931).

Faith sold its scrap aluminum processing equipment to Real Alloy Specification, LLC, for $8.7 million dollars on April 17, 2024. (Equipment Purchase and Sale Agreement, at RITT_015541 (RITT_015541–50), **Exhibit 10**). Faith last had production employees and last ran its production line in January 2024. (Ex. 5,

S. Stewart Tr., Vol. 2, at 146:21–25).[5] Faith has no plans to purchase new equipment and resume operations. (*Id.* at 144:17–21). Faith is not a functioning scrap metal processor today and was not a functioning scrap metal processor after January 2024. (*Id.* at 147:16–20). Faith renewed its Georgia corporate registration in March 2025 only to "keep[] the company open for personal reasons." (*Id.* at 145:16 – 146:2).

### D. Faith's Breach of Contract Claim Fails.

#### 1. Faith alleges a take-or-pay contract.

In pursuit of being paid for millions of pounds of tolling that never occurred, Faith claims that the parties "had an enforceable contract under which Constellium agreed to pay Faith a set rate for a minimum amount of scrap alloy." (Compl., Doc. 1-1, ¶ 21). More specifically, Faith alleges that Constellium agreed to deliver 1.3 million pounds of scrap aluminum per month from June through December 2023 (9.1 million pounds in all) and 1 million pounds per month from January through April 2024 (4 million pounds in all).[6] (*Id.* ¶¶ 8, 10–11, 16–18, 22–25). Faith then alleges that when Constellium delivered less than those amounts for Faith to toll,

---

[5] The last working day for any Faith employee was March 1, 2024, which was the last working day for Kim Watson, who handled logistics and accounting for Faith at its Rockmart plant. (Ex. 11, Kim Watson Tr. at 10:19–25, 14:15–19).

[6] Faith also claims that from May to December 2024, Constellium was obligated to deliver 1 million pounds per month and pay $200,000 per month (1 million x $0.20), even if Faith did not toll a single pound. (*Id.* ¶ 20).

"shortfalls" resulted and Constellium breached its contracts.[7] (*Id.* ¶¶ 24–25). Faith alleges that Constellium contractually agreed to pay Faith the full tolling rate for those shortfall amounts, even though Faith did not do the tolling work.[8] (*Id.* ¶ 25). Faith thus claims that Constellium agreed to and breached a take-or-pay contract. (*Id.* ¶¶ 25-27). In a take-or-pay contract, a party agrees to pay for a minimum amount of product or service regardless of whether it "takes" that product or service at the time. *See Superfos Invs. v. Firstmiss Fertilizer*, 821 F. Supp. 432, 433 (S.D. Miss. 1993).[9]

### 2. Faith must prove the definite terms of a take-or-pay contract.

"In Georgia, the essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." *Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295–96 (N.D. Ga. 2015) (citation omitted; cleaned up). "A contract is an agreement between two or

---

[7] Specifically, Faith claims shortfalls of 2,636,733 pounds in 2023, and 3,643,680 pounds in the first four months of 2024. (*Id.* ¶ 25).

[8] Specifically, Faith claims that Constellium owes it $474,611.94 for 2023 shortfalls and $728,736 for January to April 2024 shortfalls, totaling $1,203,347.94. (*Id*).

[9] "Courts have recognized, almost without exception, that 'take-or-pay' contracts are alternative performance contracts such that the 'pay' option in a 'take-or-pay' contract is not a penalty provision, and in fact is not a damages provision at all, but rather is one of the buyer's performance alternatives." *Id.* at 434 (citing cases). If the "pay" option of the contract operates as a penalty, however, it is not enforceable. *Id.* at 433-34. Although Faith does not allege any specific take-or-pay provision, much less have evidence of one, Faith's contention that Constellium should now pay full rates for no processing in 2023 and 2024 describes an unenforceable penalty.

more parties for the doing or not doing of some specified thing." Ga. Code Ann.

§ 13-1-1 (1933). "In order to establish that a contract exists under Georgia law, 'the

plaintiff in a breach of contract action has the burden of proving three elements:

subject matter of the contract, consideration, and mutual assent by all parties to all

contract terms.'" *Roland v. Ford Motor Co.*, 655 S.E.2d 259, 263 (Ga. Ct. App.

2007) (citation omitted).

While "[s]imple contracts may either be in writing or rest only in words as

remembered by witnesses," both written and oral contracts "must be certain and

definite in their terms." *Pharr v. Olin Corp.*, 715 F. Supp. 1569, 1573 (N.D. Ga.

1989) (in part, quoting Ga. Code Ann. § 13-1-5(b)). "[N]egotiations or attempts to

enter into a [contract] are not sufficient to allege a valid contract." *Brooks*, 107

F. Supp. 3d at 1296. Furthermore,

> [f]or oral contracts to be enforceable under Georgia law it
> must be shown that there was a meeting of the minds of
> the contracting parties – mutuality – as to every essential
> element of the oral agreement. It must be shown 'with
> reasonable certainty as to what the parties were obligating
> themselves to do to effect what they envisioned . . . ', and
> 'in order for the contract to be valid, the agreement must
> ordinarily be expressed plainly and explicitly enough to
> show what the parties agreed upon. *A contract cannot be
> enforced in any form of action if its terms are incomplete
> . . . incomprehensible. . . . '– vague, indefinite or uncertain.*

*Pharr*, 715 F. Supp. at 1573 (citation omitted; emphasis added); *see also King v.*

*State Farm Mut. Auto. Ins. Co.*, 160 S.E.2d 230, 231 (Ga. Ct. App. 1968) (finding

the representation that "at the proper and appropriate time plaintiff would be compensated in full for his personal injuries" was too indefinite to be an enforceable contract).

Accordingly, Faith first must prove that a definite take-or-pay contract exists, particularly that that the parties' minds met on specific take-or-pay terms.

### 3. Faith has no evidence of a take-or-pay contract with Constellium.

Faith's breach of contract claim fails from the outset because Faith cannot prove the existence of the take-or-pay contract it seeks to enforce.[10]  Faith has no evidence that Constellium contractually agreed to pay Faith for monthly minimums of tolling regardless of whether the tolling occurred. That is, Faith has no evidence Constellium contractually agreed to pay for nothing.

### a. Faith has no evidence of a written contract.

Faith has no evidence of a written take-or-pay contract for 2023. Faith admittedly "does not have a single, specific document in which Constellium agreed to deliver a minimum of 9,100,000 pounds of scrap aluminum alloy from June through December, *i.e.*, 1,300,000 pounds per month, for the final seven months of 2023." (Ex. 15, Faith's Ans. to R.F.A. No. 7, Faith's Discovery Responses at 30).

---

[10] "For issues on which the non-movant would bear the burden of proof at trial, the moving party simply may show—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (citation omitted; cleaned up).

Instead, Faith contends that the 2023 contract arose from multiple calls and email between Garey Rittenhouse and Shawn George from May to December 2023. (Ex. 15, Faith's Ans. to Interrog. No. 3, Faith's Discovery Responses at 2–3).

The first time Faith mentioned 1.3 million pounds per month was in a December 12, 2023 email from Mr. Rittenhouse in which he referred to Faith's "planned production volume of 1.3mm in 2023." (Email from G. Rittenhouse to S. George (Dec. 12, 2023), Ex. A to Compl. at 14 of 21, **Exhibit 19** [hereinafter "December Email String"]). The importance of this fact cannot be overemphasized. Faith has no evidence that the amount of 1.3 million pounds per month ever came up in communications with Constellium before it mentioned the figure on December 12 as the amount that *Faith* internally planned on tolling. Faith has no basis to take this internal planning amount, first mentioned in December, and convert it to the amount of a contractual guarantee Constellium purportedly made six months earlier.

After sending the December 12 email, Mr. Rittenhouse had a telephone call with Mr. George on December 13, 2023. Mr. Rittenhouse then sent an email summarizing the call from his perspective and proposing terms for a 2024 contract between Faith and Constellium that would also make up for a purported "shortfall" of nearly 3 million pounds in 2023. (Ex. 19, December Email String, Ex. A to Compl. at 12 & 13 of 21). The December 13 email requests "a copy of the draft contract template so we can start the review process." (*Id.* at 13 of 21). Constellium did not

14

respond to Mr. Rittenhouse's December 13 email with a written acceptance of Faith's proposed terms or a proposed contract. (Ex. 5, S. Stewart Tr., Vol. 2 at 101:22–102:21, 104:1–107:18). Thus, no document memorializes a guarantee by Constellium to deliver 1.3 million pounds of scrap for tolling each of the last seven months of 2023, much less memorializes a take-or-pay agreement based on that amount in 2023.

Faith also has no evidence of a written take-or-pay contract for 2024. Faith contends that the communications that formed the 2024 contract occurred in multiple calls and email between Garey Rittenhouse and Shawn George from December 2023 to January 2024. (Ex. 15, Faith's Ans. to Interrog. No. 4, Faith's Discovery Responses at 3–4). None of the email or the attached purchase order, however, is evidence of the contract that Faith must prove.

On January 9, 2024, Mr. George sent Mr. Rittenhouse a purchase order for the first four months of 2024. In his transmittal email, Mr. George stated, "I am still working on the formal contract for 2024. Once we have the contract all buttoned up, we will still need POs for functional day-to-day business, so we will use this PO regardless." (Ex. 20, Jan. 9, 2024 Email from S. George to G. Rittenhouse, Ex. B to Compl. at 17 & 18 of 21). The January 9, 2024 purchase order is for tolling services, the quantity term is 1 million pounds per month (January through April), and the rate is $0.2931 per pound. (Ex. 20, Purchase Order, Ex. B to Compl. at 20 & 21 of 21).

The purchase order required Faith to accept it by returning a signed acknowledgement, but Faith did not sign or accept the purchase order. (Ex. 5, S. Stewart Tr., Vol. 2 at 114:19–115:20 (stating that Faith did not sign the purchase order because Constellium had not yet proposed a formal contract and "we were still negotiating")). Constellium's purchase order was merely an offer, not a fully formed contract simply because Constellium sent it. *See Atlanta Plow Co. v. Bennett*, 176 S.E. 822, 823 (Ga. Ct. App. 1924) ("An order to ship goods of a certain description is an offer to buy the described good upon the terms stipulated in the offer … ."). Constellium's "unaccepted order did not itself constitute a valid contract, as it was wanting in mutuality until accepted," *Chickamauga Mfg. Co. v. Augusta Grocery Co.*, 98 S.E. 114, 114 (Ga. Ct. App. 1919), and Faith's performance of some tolling in January 2024 does not transform the unaccepted purchase order into a contract, *Tampa Inv. Grp., Inc. v. Branch Banking & Tr. Co.*, 723 S.E.2d 674, 680 (Ga. 2012) (stating that "a contract which is either not reduced to writing or defectively so reduced and which is sought to be enforced based on part performance must be certain and definite in all essential particulars") (citation omitted; cleaned up).

Even if Faith had accepted the January 9, 2024 purchase order, the purchase order could not confirm a contract for 2023 or create a contract for 2024 at a different rate than it specifies. First, nothing in the document mentions 2023 shortfalls, catch-up payments, or anything about 2023 whatsoever. (Ex. 5, S. Stewart Tr., Vol. 2 at

113:12–114:2). To the extent that Faith contends Constellium had an oral agreement that led to 2023 shortfalls, the purported oral agreement could not explain or modify the January 9, 2024 purchase order. *See Dolanson Co. v. Citizens & S. Nat'l Bank*, 251 S.E.2d 274, 276–77 (Ga. 1978) (Georgia's parol evidence rule prohibits "engraft[ing] … oral conditions onto the unconditional terms" of an unambiguous written contract). Second, the purchase order could not create a 2024 contract at the $0.20 per-pound rate that Faith now seeks to enforce against Constellium. (Compl., Doc. 1-1, ¶ 25 (seeking to apply a $0.20 rate, which "exclude[es] the additional $0.0931 that was designed to cover the 2023 shortfall")). The only rate in the purchase order is $0.2931 per pound. The purchase order lacks the $0.20 price term that Faith seeks to import from Mr. Rittenhouse's December 13, 2023 proposal for Faith. (*See* Ex. 5, S. Stewart Tr., Vol. 2 at 113:9–22). Constellium, however, did not accept Faith's December 13 proposal. (*See* Ex. 5, S. Stewart Tr., Vol. 2 at 101:22–102:21). Faith has no document or collection of documents showing that Constellium agreed to a rate of $0.20 per pound in 2024. *See Baker v. Jellibeans, Inc.*, 314 S.E.2d 874, 876–77 (Ga. 1984) (stating that for multiple documents to form a written contract, "all the necessary terms [must be] contained in signed contemporaneous writings").

17

### b.  Faith has no evidence of an oral contract.

To the extent Faith contends that an oral contract arose from oral communications between Garey Rittenhouse and Shawn George, Faith has no evidence that it, as a corporation, agreed to any contract terms.[11]

<u>First</u>, Mr. Rittenhouse had no ability to directly enter into a contract for Faith.[12]  Mr. Rittenhouse owns and operates a separate business, Regional Metal Services, which is unaffiliated with Faith. (Ex. 4, S. Stewart Tr., Vol. 1 at 22:7–13). Mr. Rittenhouse could negotiate contract terms for Faith, but he could not sign a contract for it. (Ex. 4, S. Stewart Tr., Vol. 1 at 48:9–12; Ex. 5, S. Stewart Tr., Vol. 2 at 140:11–22). Simply put, Faith did not give Mr. Rittenhouse the authority to bind the corporation to a contract. (Ex. 4, S. Stewart Tr., Vol. 1 at 48:13–17, 49:9–13, 50:3–7, 54:5–13).[13]

<u>Second</u>, Faith has no evidence that the corporation entered an oral contract with Mr. Rittenhouse as a conduit. No one who could enter a contract for Faith

---

[11] Faith also has no evidence that Constellium, as a limited liability company, agreed to any contract terms.

[12] Faith also has no evidence that Shawn George could directly enter into a contract for Constellium, a limited liability company. Mr. Stewart does not know if Mr. George had the authority to enter a contract for Constellium, (Ex. 4, S. Stewart Tr., Vol. 1 at 51:20–52:2), and, in fact, Mr. George did not have that authority, (Ex. 1, S. George Tr. at 71:3–16).

[13] Furthermore, Mr. Rittenhouse is not a party to this lawsuit, and Faith is not providing legal counsel for Mr. Rittenhouse. (Ex. 4, S. Stewart Tr., Vol. 1 at 22:15–23:4, 51:14–19).

knows what Mr. Rittenhouse and Mr. George discussed. "Faith's personnel were not participants in most of the[] calls [that purportedly formed an oral contract] but instead relied on Garey Rittenhouse … ." (Ex. 15, Faith's Ans. to Interrog. No. 3, Faith's Discovery Responses at 2–3; *see also id.* at 3–4, Faith's Ans. to Interrog. No. 4 (same)). Muriel Stewart was not involved in the day-to-day aspects of the Faith-Constellium relationship and is not aware of what Mr. Rittenhouse said or did. (Ex. 3, M. Stewart Tr. at 13:13–14:12, 24:22–25:2, 25:25–26:5, 31:6–10). While Steve Stewart made Faith's operational and contracting decisions, he has no specific knowledge of what Mr. Rittenhouse and Mr. George discussed. "I don't know" about any evidence of an email or call between Mr. Rittenhouse and Mr. George where Constellium agreed to provide 1.3 million pounds per month, Mr. Stewart testified. "You'd have to talk to Mr. Rittenhouse." (Ex. 4, S. Stewart Tr., Vol. 1 at 47:3–13).[14] When Faith's principals are unaware of the terms purportedly negotiated by Mr. Rittenhouse, Faith cannot have a meeting of the minds on those terms.

---

[14] *See also* Ex. 5, S. Stewart Tr., Vol. 2 at 94:17–23 ("I guess that's a conversation that [Mr. Rittenhouse] had with Shawn George … . I don't know for sure."); *id.* at 98:14–24 ("I have never spoken with Shawn George."); *id.* at 99:23–100:1 ("Garey did all the contact with Shawn George."); *id.* at 102:22 – 103:1 ("I do not know" if Mr. George spoke to Mr. Rittenhouse after the December 13, 2023 email. "You'd have to ask Mr. Rittenhouse."); *id.* at 112:4–13 ("I can't speak for Mr. Rittenhouse …"); *id.* at 120:21–23 ("I do not know" if Mr. Rittenhouse proposed contract terms to Mr. George in late January 2024. "I don't remember.").

### 4. Evidence demonstrates that Constellium did not enter into a take-or-pay contract with Faith.

Not only does Faith lack any evidence of a take-or-pay contract, but evidence negates that Constellium contractually agreed to pay Faith for no work.[15]

<u>First</u>, Faith never said it wanted a contract for 1.3 million pounds minimum per month. Instead, Faith said in May 2023, that it needed 700,000 pounds per month of incoming scrap as a minimum amount, (Ex. 14, May 19, 2023 Email at RITT_012844 – 45), and Faith said that it would allocate 1 million pounds of its capacity per month to tolling poly 5052 scrap, (Ex. 7, May 9, 2023 Email at RITT_012842).

<u>Second</u>, Faith said Constellium would pay only for the work Faith performed. Mr. Rittenhouse confirmed to Constellium on June 14, 2023, that Faith wished to share its banking information with Constellium, "so Constellium may remit payment for ***tolling services rendered***," not for 1.3 million pounds per month regardless of whether Faith performed the tolling. (Email from G. Rittenhouse to T. Sizemore, FAC_0001593 (June 14, 2023) (emphasis added), **Exhibit 16**).

---

[15] "For issues on which the non-movant would bear the burden of proof at trial the moving party also may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *Fitzpatrick*, 2 F.3d at 1115–16 (citation omitted; cleaned up).

Third, Faith sought payment only for the work it performed. Faith invoiced Constellium in 2023 for the amounts of poly 5052 scrap that Faith processed and not for 1.3 million pounds per month. (Ex. 11, K. Watson Tr. at 36:16–24).

Fourth, Mr. Rittenhouse likewise invoiced Faith for his Constellium commissions based on the pounds of poly 5052 scrap delivered to Faith for processing, not on any minimum amounts that Mr. Rittenhouse supposedly negotiated. (*See* RMS Invoice No. 1544, FAC_0003302, (6/30/2023); RMS Invoice No. 1547, RITT_020449, (7/31/2023); RMS Invoice No. 1549, RITT_020450, (8/31/2023); RMS Invoice No. 1552, RITT_020452, (9/30/2023); RMS Invoice No. 1553, RITT_020453, (10/31/2023); RMS Invoice No. 1556, RITT_020454, (11/30/2023); RMS Invoice No. 1557, RITT_020456, (12/31/2023); RMS Invoice No. 1559, RITT_013238, (2/27/2024), collectively **Exhibit 12**).

Fifth, Faith's conduct was inconsistent with alleged contractual obligations to Constellium. Faith actively marketed its plant for sale in 2023, (*see supra* § I(C)), and would not have been able to fulfill its alleged contractual obligations to Constellium had it sold its plant.

Sixth, Faith told Constellium not to deliver scrap to be processed in December 2023. Faith told Constellium that "[c]urrently, we think it best if we pause deliveries into the Georgia plant beginning on 12/14/23 so we do not add to the current production schedule backlog." (Ex. 19, December Email String, Ex. A to Compl. at

14 of 21). According to Mr. Stewart, "we were planning on giving our employees two weeks off for Christmas and we didn't want a lot of materials sitting on the ground." (Ex. 5, S. Stewart Tr., Vol. 2 at 97:14–23).

Seventh, Faith concedes that the parties were still negotiating in late December 2023 and ended the year without a contract. (Ex. 5, S. Stewart Tr., Vol. 2 at 85:17–86:5, 101:22–102:21, 104:1–107:18).

Eighth, Faith concedes that the parties were still negotiating in late January 2024 and never agreed on a contract for 2024. (*See* Email from G. Rittenhouse to S. Stewart, RITT_011631–2 (Jan. 24, 2024), **Exhibit 21** (discussing terms that Faith could propose); Ex. 5, S. Stewart Tr., Vol. 2 at 116:22–117:11 (Faith still was "trying to negotiate a deal" with Constellium in late January 2024)).

Ninth, according to Mr. Stewart, "[Constellium] never signed a contract [with Faith] period." (Ex. 5, S. Stewart Tr., Vol. 2 at 118:3–5).

Tenth, Constellium never entered take-or-pay contracts with tolling vendors. (Ex. 2, J. Fife Tr. at 21:12–21).

Eleventh, Faith could not toll scrap aluminum after January 2024. Faith terminated the parties' relationship and shut down production at the end of January 2024. (*See supra* § I(C)). Faith immediately put its assets up for sale and completed the sale of its production equipment in April 2024, ensuring that it could not perform any purported 2024 contract. (*See id.*).

### E. Faith's Alternative Promissory Estoppel Claim Fails.

In the alternative to breach of contract, Faith claims,

> [i]n reliance upon the parties' agreement and Constellium's commitment to pay Faith $1,638,000 in connection with processing of 9,100,000 pounds of scrap alloy in 2023, Faith purchased approximately $1,100,000 in necessary equipment and made other investments required to fulfill its obligations to Constellium.

(Compl., Doc. 1-1, ¶ 31).

> The essential elements of promissory estoppel are: (1) the defendant made a promise or promises; (2) the defendant should have reasonably expected the plaintiffs to rely on such promise; (3) the plaintiffs relied on such promise to their detriment; and (4) an injustice can only be avoided by the enforcement of the promise, because as a result of the reliance, plaintiffs changed their position to their detriment by surrendering, forgoing, or rendering a valuable right.

*Rental Equip. Grp., LLC v. Maci, LLC*, 587 S.E.2d 364, 367 (Ga. Ct. App. 2003) (citation omitted).  Faith has no evidence to prove any of these four elements.

First, Faith has no evidence that Constellium "made a promise" to pay Faith $1,638,000 for tolling 9.1 million pounds of scrap in 2023.  (*See supra* § I(D)(3)).

Second, Constellium could not have reasonably expected Faith to rely on any promise to its detriment. Faith never told Constellium that it needed additional equipment—specifically, a Wolf Shredder or Bivitek screen—to toll for Constellium. (Ex. 5, S. Stewart Tr., Vol. 2 at 158:24–159:6).

23

<u>Third</u>, Faith did not rely on any promise to its detriment, because it did not need the new equipment to toll for Constellium. Faith did not purchase the equipment, a Wolf shredder and Bivitek screen, until October 2023 and did not even install the Wolf shredder until January 2024. (Ex. 15, Faith's Ans. to Interrog. No. 5, Faith's Discovery Responses at 5–6; Ex. 5, S. Stewart Tr., Vol. 2 at 156:19–157:18, 158:4–14; Ex. 4, S. Stewart Tr., Vol. 1 at 66:3–12). Faith had the capacity to toll 1.3 million pounds per month in 2023 without the Wolf shredder or Bivitek screen. (Ex. 5, S. Stewart Tr., Vol. 2 at 157:19–159:3).

<u>Fourth</u>, no injustice has resulted from Faith's purchase of the equipment. Faith sold its production assets, including the newly purchased equipment, in April 2024 for $8.7 million. (*See* Ex. 10, Equipment Purchase and Sale Agreement, at RITT_015549 (listing Wolf shredder and Bivitek screen)). Faith already recouped the value of the equipment it purportedly purchased in reliance on Constellium.

## F. Faith's Claim for Attorneys' Fees Fails.

Faith claims entitlement to attorneys' fees because Constellium "has acted in bad faith, has been stubbornly litigious, and has put Faith to unnecessary trouble and expense by failing to pay amounts owed under the parties' agreement and by forcing Faith to commence this civil action to recover the amounts owed." (Compl., Doc. 1-1, ¶ 39 (citing Ga. Code Ann. § 13-6-11)). This claim, too, fails. As the foregoing amply demonstrates, Faith has been unable to develop any evidence in support of its

claim that Constellium agreed to pay Faith for **not** doing tolling work. Nothing about Constellium's refusal to pay Faith's unreasonable demand or Constellium's defense of this action has been in bad faith.[16]  If anything, Faith has been unreasonably and stubbornly litigious. Faith shut down its plant and sold its production equipment **before** it filed this lawsuit, claiming that Constellium should pay millions of dollars for tolling in 2024 that Faith knew it could not perform. (*See supra* § I(C)).

## II.  CONCLUSION

Faith cannot prove the existence of the contract it claims Constellium breached. Faith has no evidence that Constellium contractually agreed to deliver minimum amounts of scrap aluminum for Faith to toll nor evidence that Constellium contractually agreed to pay anything, much less the full per-pound rate, if it did not deliver the purported minimum amounts. Faith also has no evidence to prove any element of its alternative promissory estoppel claim. Faith did not buy new equipment until months after it began to toll, and it recouped that investment by selling the equipment. Finally, Faith has no evidence of bad-faith litigation by Constellium. All Constellium has done is resist Faith's baseless claims. Accordingly, Constellium is entitled to summary judgment that it has no liability to Faith.

---

[16] Regardless, the claim fails as a matter of law.  In a contract case, "a mere refusal to pay a debt" is not sufficient to warrant fee-shifting under the statute. *Jordan Bridge Co. v. I.S. Bailey, Jr., Inc.*, 296 S.E.2d 107, 109 (Ga. Ct. App. 1982) (citations omitted).

Respectfully submitted,

**CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC**

**By Counsel:**

*/s/ John J. Meadows*
**JOHN J. MEADOWS**
Georgia Bar No. 311901
john.meadows@steptoe-johnson.com
STEPTOE & JOHNSON PLLC
707 Virginia St. E., Suite 1700
Charleston, WV 25301
281.203.5700

***Attorney for Defendant Constellium Rolled Products Ravenswood, LLC***

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 5.1(C)</u>

I, John J. Meadows, counsel for Constellium Rolled Products Ravenswood, LLC, certify that the foregoing brief was prepared in Times New Roman 14-point font in compliance with Local Rule 5.1(C).

*/s/ John J. Meadows*
**JOHN J. MEADOWS**
Georgia Bar No. 311901
john.meadows@steptoe-johnson.com
STEPTOE & JOHNSON PLLC
707 Virginia St. E., Suite 1700
Charleston, WV 25301
281.203.5700

***Attorney for Defendant Constellium
Rolled Products Ravenswood, LLC***

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ROME DIVISION

**FAITH ALUMINUM COMPANY,**

    **Plaintiff,**

**v.**                                    **Civil Action No. 4:24-cv-00151-WMR**

**CONSTELLIUM ROLLED
PRODUCTS RAVENSWOOD, LLC,**

    **Defendant.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2025, a true and correct copy of the above and foregoing document was filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

                            */s/ John J. Meadows*
                            **JOHN J. MEADOWS**