# Exhibit 1

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                         ROME DIVISION

4                     * * * * * * * * *

5    FAITH ALUMINUM COMPANY,*

6          Plaintiff        *   Case No.

7          vs.              *   4:24-CV-00151-WMR

8    CONSELLIUM ROLLED       *

9    PRODUCTS RAVENSWOOD,    *

10   LLC,                    *

11         Defendant        *

12                     * * * * * * * * *

13

14                      DEPOSITION OF

15                      SHAWN GEORGE

16                      April 1, 2025

17

18

19

20

21

22

23        Any reproduction of this transcript is prohibited

24        without authorization by the certifying agency.

25

Page 2

1                          DEPOSITION

2                              OF

3       SHAWN GEORGE, taken on behalf of the Plaintiff herein,

4       pursuant to the Rules of Civil Procedure, taken before

5       me, the undersigned, Corey Riner, a Court Reporter and

6       Notary Public in and for the Commonwealth of

7       Pennsylvania, at the offices of Steptoe & Johnson,

8       Chase Tower 707 Virginia Street East, 17th Floor,

9       Charleston, WV, on Tuesday, April 1, 2025 beginning at

10      10:00 a.m.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 247

1

2      STATE OF WEST VIRGINIA   )

3

4                           CERTIFICATE

5          I, Corey Riner, a Notary Public in and for the

6      State of West Virginia, do hereby certify:

7          That the witness whose testimony appears in the

8      foregoing deposition, was duly sworn by me on said date,

9      and that the transcribed deposition of said witness is a

10     true record of the testimony given by said witness;

11         That the proceeding is herein recorded fully and

12     accurately;

13         That I am neither attorney nor counsel for, nor

14     related to any of the parties to the action in which these

15     depositions were taken, and further that I am not a

16     relative of any attorney or counsel employed by the

17     parties hereto, or financially interested in this action.

18         I certify that the attached transcript meets the

19     requirements set forth within article twenty-seven,

20     chapter forty-seven of the West Virginia Code.

21

22

23

24     _____

25                      Corey Riner, Court Reporter

Page 15

1    Campus.

2    Q.    Okay.

3          And what did you --- what were the general

4    subjects that you studied at those schools?

5    A.    Excel.

6    Q.    Microsoft Excel?

7    A.    Yes, sir.

8    Q.    Okay.

9          But you don't have any degrees from them?

10   A.    No.

11   Q.    Okay.

12         Do you hold any professional licenses or

13   certifications?

14   A.    No.

15   Q.    So your current employer is Constellium Rolled

16   Products, Ravenwood --- Ravenswood, LLC.

17         Correct?

18   A.    Yes.

19   Q.    How long have you worked for Constellium?

20   A.    Three years.

21   Q.    Okay.

22         What is your --- what is your title?

23   A.    Metal champion.

24   Q.    And what is --- well, withdraw that.

25         Who do you directly report to?

Page 17

1    Q.    Okay.

2    A.    Thomas Anderson.

3    Q.    Okay.

4    A.    Emily Jordan.

5    Q.    Okay.

6          Anyone else?

7    A.    I think that would do it.

8    Q.    Okay.

9          What are your job responsibilities as a metal

10   champion?

11   A.    My primary responsibility is to buy scrap aluminum

12   to support the production of aluminum alloys at

13   Ravenswood.

14   Q.    Okay.

15         So are you --- then is it fair to say that you're

16   responsible for identifying vendors --- well, let me

17   withdraw that question.

18         Are you responsible for identifying vendors to

19   process scrap alloy for Constellium?

20   A.    I contribute to that.

21   Q.    Okay.

22         Who else contributes to that?

23   A.    There's other professional contacts amongst people

24   who work there.

25   Q.    There being Constellium?

Page 18

1   A.    Yeah, Ravenswood.  And within the Constellium

2   company.

3   Q.    Okay.

4        So is Constellium Ravenswood --- how --- is

5   Constellium Ravenswood a subsidiary of a larger

6   Constellium organization?  I'm trying to understand

7   how Constellium Ravenswood fits into the overall

8   Constellium umbrella, if you will.

9   A.    Okay.  Constellium as a company is headquartered

10  in France.

11  Q.    Okay.

12  A.    They have multiple operations in Europe.  They

13  have the Ravenswood, West Virginia facility and a

14  Muscle Shoals, Alabama Facility in the United States.

15

16  Q.    Okay.

17       And this may be a dumb question, but is

18  Constellium Ravenswood --- is there a town called

19  Ravenswood?

20  A.    Yes, there is.

21  Q.    Okay.

22       So --- and that's where Constellium Ravenswood is

23  located?

24  A.    Exactly.

25  Q.    Have you ever worked for any other companies under

Page 23

1   A.      They were to take aluminum scrap that I bought ---

2   we bought, and process it into a form that we could

3   use.

4   Q.      Okay.

5       What does that --- processing it into a form that

6   you can use, what does that entail?

7   A.      Shredding to a particular size and density ---

8   Q.      Okay.

9   A.      --- and removing contaminants.

10  Q.      Contaminants such as what?

11  A.      In this particular case, it was poly, sometimes

12  referred to as ProTEX.  It's that plastic cover that's

13  on a new piece of aluminum to protect it from being

14  scratched.

15  Q.      Okay

16      Can you give me an example of, you know, what kind

17  of scrap that Constellium asked Faith to process?

18  Like it was scrap aluminum from what?

19  A.      In particular, it was scrap aluminum from the

20  manufacturer of light delivery box trucks and truck

21  cabs.

22  Q.      Okay.

23      So they would --- and this may not be the

24  scientific explanation, but I'm just trying to have a

25  general understanding.  They would take that scrap,

Page 24

1    remove the paint and sealant and covering that's on it

2    to deliver an unpainted, unsealed shredded product.

3        Is that fair?

4    A.    We refer to it as clean and bare.

5    Q.    Okay.

6        And so where --- you said that they processed or

7    told scrap aluminum that Constellium bought.  Where

8    did Constellium get the scrap alloy that it asked

9    Faith to process?

10   A.    Bought it from multiple sources.  And ultimately

11   the source of the scrap itself was from --- typically

12   from manufacturers.

13   Q.    Okay.

14       Does the scrap go from --- kind of the supply

15   chain, does it go directly from the manufacturer to

16   Constellium to Faith, or is there some other entities

17   in that are in that chain somewhere?

18   A.    There are.  There's a path from the manufacturer

19   ---

20   Q.    Okay.

21

22   A.    --- to the scrap dealer or broker from whom I

23   bought it to Faith, and then Constellium would pick it

24   up at Rock Martin.

25   Q.    And so Constellium took title to it.  In other

Page 25

1       words, Faith never owned the product.

2           Correct?

3       A.    Correct.

4       Q.    From the time it in this chain left the scrap

5       dealer, at that point, it was Constellium owned the

6       product?

7       A.    Constellium owned it when Faith received it.

8       Q.    Okay.

9           And who are some of the scrap dealers or the

10      primary scrap dealers that you bought scrap from for

11      Faith to process?

12      A.    United Scrap Metal.

13      Q.    Okay.

14          Any others?

15      A.    Yes.  Goldy Metal.

16      Q.    Okay.

17      A.    Kripke Enterprises.  Those are the three primary

18      suppliers.

19      Q.    Okay.

20          And are those --- those suppliers are all scrap

21      dealers.

22          Correct?

23      A.    Dealers, Brokers.

24      Q.    Dealers, brokers.

25          And I'm sorry, you may have just told me this, but

Page 27

1    was the word?  Sow?

2    A.    S-O-W.

3    Q.    S-O-W, okay.

4        And was that --- is that a liquid?

5    A.    No, it's a block of aluminum that weighs about

6    1,500 pounds.

7    Q.    When Constellium hires a vendor, a processor to

8    toll scrap metal, does Constellium typically enter

9    into written contracts with those processors?

10   A.    Yes.

11   Q.    And let me go back and ask you about the furnace

12   operators.  Roughly how many of those type companies

13   does Constellium Ravenswood utilize to process scrap?

14

15   A.    We utilize three.  There are about five or six

16   that we can use.

17   Q.    Who are the three that you use?

18   A.    We use a company called Alrec.

19   Q.    Okay.

20   A.    Real Alloy in Friendly, West Virginia.

21   Q.    Okay.

22   A.    And Real Alloy in Coldwater, Michigan.

23   Q.    And are those real alloy companies that you

24   mentioned related to the company that you used to work

25   for?

1    A.    Everybody contributes toward ensuring that it

2    meets that standard.  Ultimately, Faith, or whichever

3    toller receives that medal and puts eyes on it at that

4    receiving dock is the final gate to pass through.

5    Q.    And is it fair to say that once the scrap is

6    processed, it also has to meet certain quality

7    standards?

8    A.    Yes.

9    Q.    And do those standards likewise vary depending on

10   the specific scrap being processed or you know, as

11   case by case basis?

12   A.    No.

13   Q.    Okay.

14   A.    Then they conform to our very tight standards.

15   Q.    Okay.

16        And I assume that in those instances, it's the

17   tolling vendor who is responsible for ensuring that

18   the tolled product meets those tight standards?

19   A.    Yes.

20   Q.    What are Constellium's typical payment terms with

21   respect to paying the processors of scrap alloy?

22   A.    Net 45.

23   Q.    And how do Constellium's processing companies or

24   the companies that it hires to process the scrap, how

25   do they typically charge for processing scrap?

Page 31

1    A.    By the pound inbound.

2    Q.    Okay.

3        And just so the record is clear, is it fair to say

4    that if a certain amount is delivered to the

5    processor, it's based on that weight at the time that

6    it arrives at the processor?

7    A.    Yes, the net weight of that delivery.

8    Q.    And net of what?

9    A.    Net of any dunnage or tare weights.

10   Q.    Okay.

11       And you're going to have to help me out here.

12   What is dunnage and what is tare weights?

13   A.    Tare weights might be --- dunnage and tare weights

14   are terms that are sometimes used interchangeably, but

15   it would be pallets, boxes, bags, ---

16   Q.    Okay.

17   A.    --- banding.

18   Q.    Okay.

19       That's dunnage and tare weight?

20   A.    It's referred to --- yes, they're referred to the

21   same frequently.

22   Q.    Okay.  Okay.

23       So just --- we're not --- they charge you based on

24   the actual product that they're going to process, not

25   any packaging that goes with it, if that's a fair

Page 32

1    simplistic way to explain it?

2    A.    Yes, that's accurate.

3    Q.    For the type of scrap alloy that Faith processed,

4    what is the typical range of price per pound for that

5    kind of material?

6    A.    Faith basically defined that because they were

7    unique in their processing capabilities.  So what it

8    comes down to is negotiating something, a charge that

9    supports purchasing the scrap and consuming it.

10   Q.    Okay.

11        What about for the furnace vendors?  Do they also

12   charge a price per pound?

13   A.    Yes.

14   Q.    And what is a typical range for those types of

15   vendors?

16   A.    There are many of them, ---

17   Q.    Okay.

18   A.    --- and it's very competitive.  The price range is

19   between --- depending on the variability of the raw

20   material, and it can range from 12 cents a pound to 20

21   cents a pound.

22   Q.    Okay.

23        Does that variation --- what factors go into that

24   variation?

25   A.    Primarily the recovery, the amount of

Page 34

1    A.    Yes.

2    Q.    And just so the record's clear, yes, ---.

3    A.    That is not the case.

4    Q.    Okay, thanks.

5        I think we talked about this earlier with regard

6    to the Muscle Shoals.  You said that at some point

7    Constellium had purchased some --- the Constellium's

8    branch or division in Muscle Shoals had purchased some

9    product from Faith that Faith had on hand.

10   A.    Yes.

11   Q.    But before 2023, had Constellium Ravenswood ever

12   hired Faith to toll scrap alloy?

13   A.    Not to my knowledge, no.

14   Q.    Tell me how that relationship, the relationship

15   between Constellium Ravenswood and Faith in 2023, tell

16   me how that came about.

17   A.    I was doing business with Goldy Metals, ---

18   Q.    Okay.

19   A.    --- and he offered me a shredded 5052 package.

20   During the course of that conversation, he mentioned

21   that it was coming from Poly 52, at which point I

22   said, no, thanks.  I don't want anything like that.

23   It's not going to work.  We went back and forth about

24   whether or not it would be of high enough quality for

25   Ravenswood, clean enough, and agreed to do a trial

Page 35

1    load of three loads.

2    Q.    Okay.

3         And you said you were dealing with Goldy, and then

4    he said he had a 5052 poly.  Who is he?

5    A.    Greg Goldstein, Goldy.

6    Q.    And Greg Goldstein works at Goldy?

7    A.    He owns it.

8    Q.    Okay.

9         And I don't want to get too much into the science

10   here, but is 5052 poly --- and then you said you

11   didn't want poly.  What is 5052 poly?

12   A.    Earlier we talked about there being this poly film

13   or the ProTEX that's on the product.  In our industry,

14   we refer to that scrap as 52 poly.

15   Q.    Okay.

16   A.    So wherever, whomever, was processing that scrap,

17   they were getting it from a manufacturer.  It was

18   coming off of their line with the poly on it.  They

19   were processing it, turning it into a package they

20   could deliver somewhere, and then it was going to

21   Faith.  So the 5052 poly is a not an uncommon

22   description of that kind of scrap.

23   Q.    Okay.

24        And you said the poly, and I know you've said it,

25   and I'm just not --- it's a film?

Page 36

1   A.     It's like a plastic or a vinyl film that goes over

2   the surface of the aluminum to protect it from

3   scratching and from oxidation.

4   Q.     Okay.

5        And so Mr. Goldstein said that he had some of this

6   product, the scrap, the 5052 and were you interested

7   in buying it, and you said you weren't --- as an

8   initial position, you were not interested in buying it

9   because you didn't want poly?

10  A.     To clarify, he offered me shredded 5052.

11  Q.     Okay.

12  A.     We can only accept clean, bare scrap in

13  Ravenswood.

14  Q.     Okay.

15  A.     I always ask what was the source of the material

16  that you shredded.  And he said it was poly 5052.  And

17  at that point, I said, no, I'm not interested.

18  Q.     Okay.  Okay.

19       How does Faith come into the picture if you were

20  dealing directly with Mr. Goldstein at Goldy Metals?

21  A.     So I'll elaborate.  It'll be a little bit complex.

22  Q.     That's fine.

23  A.     We did the trial loads with Goldy.  They came in,

24  and they far exceeded our expectations.  They're an

25  excellent scrap source.  About the same time as I was

Page 37

1    doing that, I was contacted by United Scrap Metal, who

2    had a large source, large direct from the manufacturer

3    source of poly 5052 scrap that they were stuck with

4    because their previous buyer backed out of the deal

5    and they had accumulated a large amount of it in their

6    warehouse, and they were desperate to find a buyer.

7    So it was just coincidence, happy coincidence, that

8    they came to me roughly around that time knowing that

9    the product coming from Faith was high quality and

10   acceptable to Ravenswood, and their ability to process

11   poly 5052 into clean bare 52 shreds was capable.  I

12   was able to do the deal with United Scrap Metal direct

13   to Faith to process that material for Ravenswood.

14   Q.    Okay.

15       So when you were dealing --- so Goldy is --- Goldy

16   is a scrap dealer?

17   A.    He's a broker.

18   Q.    A broker.  And so is he brokering United Scraps'

19   scrap?

20   A.    No.

21   Q.    Okay.

22       So this is just two separate trial loads that

23   we're talking about, one with Goldy, one with United?

24

25   A.    No.

1    Q.    Okay.

2    A.    And the difference is in the details of what you

3    said.  The trial loads were Goldy.  That established

4    the quality standard for the metal from Faith.  And

5    then when I went to United and worked with them, there

6    was no need for trial loads.  We knew that Faith could

7    do it.

8    Q.    Got it.  Okay.

9          So I'm still trying to figure out, how does Faith

10   come into the picture?  Did you --- when you were

11   buying this stuff --- when you were talking with Goldy

12   and they said, we've got this great scrap, did you say

13   who processed this for you and that's how you found

14   out about Faith?

15   A.    Yes.

16   Q.    Okay.

17         And so --- okay.  Then how did you --- once you

18   had identified Faith as a processor that could do the

19   kind of work that you needed done to the standard that

20   you expected, how did your relationship directly with

21   Faith, how did that begin?

22   A.    Greg gave me Garey Rittenhouse's contact

23   information.

24   Q.    And who did you understand that Mr. Rittenhouse

25   worked for?

Page 42

1   A.    Okay.

2                          ---

3              (Whereupon, Exhibit P-1, Email Chain,

4       was

5              marked for identification.)

6                          ---

7              THE WITNESS:

8              Okay, I've read this.

9    BY ATTORNEY WITHERS:

10   Q.    Okay.

11        Do you recognize this document?

12   A.    Yes.

13   Q.    Okay.

14        This is an email chain between you and Garey

15   Rittenhouse in April and May of 2023.

16        Right?

17   A.    Uh-huh.

18   Q.    Okay.

19        If we look at the first email chronologically from

20   April 24th of 2023, the subject line is Faith Aluminum

21   3003 Shredded Product.  And he says, Joe Schultz

22   forwarded me the information on Ravenswood's 3003

23   activity for May, and I thought it might be an

24   opportunity to introduce our 3003 shredded package

25   that we produce at our Rockmart, Georgia facility.

Page 43

1    What is --- do you call it 3003?  I mean, I'm just
2    saying 3003.  What do you call it in the industry?
3    A.    It's commonly spoken as three double o three.
4    Q.    Three double o three.  Thank you.  What is 3003?
5    A.    It is a different alloy.  It's a specific alloy of
6    aluminum.
7    Q.    And is 5052 another specific alloy of aluminum?
8    A.    Yes.
9    Q.    And so when Mr. Rittenhouse referred to our
10   Rockmart, Georgia facility, did you understand that to
11   be Faith Aluminum?
12   A.    Yes.
13   Q.    Okay.
14        And then so on May 4th, you responded to Mr.
15   Rittenhouse, sorry for this slow response here.  We
16   would be interested in shredded 3003 for Ravenswood.
17        Did you have negotiations --- what negotiations,
18   if any, did you have with him about that 3003 product
19   from that point forward?
20   A.    That product was not suited to our specifications
21   because of its chemical analysis, and they were unable
22   to refine that analysis any further.  And so it became
23   a non-opportunity.
24   Q.    Okay.
25        And I'm going to --- from time to time, I may go

Page 71

1    A.    Yes.

2    Q.    Okay.

3         Tell me about those --- tell me about the

4    discussions regarding a written contract.

5    A.    Getting a written contract at Constellium is a

6    extensive process.  I don't conduct that as an

7    individual.  I don't have the authority to do that

8    myself.  So I contribute my input, I establish the

9    relationship with the toller.  I work through all the

10   details as far as pricing, expected recoveries, all

11   those sort of mechanical like operational type

12   details. I carry that to our legal department.  They

13   build a contract framework, we submit that to a

14   vendor, their lawyers look at it, and then we start

15   the red line back and forth about all those details.

16   It can sometimes take months and months.

17   Q.    Okay.

18        But during those months and months, you need to

19   have some way to conduct business while you're waiting

20   on the lawyers to do their thing.

21        Right?

22   A.    Yes.

23             ATTORNEY MEADOWS:

24             Objection to form.

25   BY ATTORNEY WITHERS:

Page 74

1    BY ATTORNEY WITHERS:

2    Q.    Okay.

3          Do you recognize this email chain?

4    A.    Yes.

5    Q.    This is an email chain that you were included on

6    the most recent email, which was dated September 6th,

7    2023?

8    A.    Yes.

9    Q.    Okay.

10         If we look at the first email chronologically,

11   that begins at the bottom of the page with the last

12   two digits, 45 onto 46, this is an email from Shawn --

13   - from Garey Rittenhouse to you.

14         Correct?

15   A.    Yes.

16   Q.    And it's dated May 19th, 2023.

17         Right?

18   A.    Yes.

19   Q.    Is this the email from which you copied and pasted

20   what we looked at in Exhibit 4?

21   A.    My email to Buddy and Brian?

22   Q.    Yes, sir.

23   A.    Yes.

24   Q.    Okay.  Okay.

25         So then the next email chronologically forward is

1    from June 5th, 2023, from you to Ms. Tabitha Sizemore,

2    copying Michelle Brotherton.  Do you see that?

3    A.    Yes.

4    Q.    And you write, please enter a toll PO for the poly

5    5052 shred at Faith Aluminum for June 2023, 1.5

6    million pounds.  Poly 5052 to be shredded at 16 cents

7    a pound inbound.  Finished product to be picked up by

8    Constellium at Rockmart, GA via dump trailer.

9        Do you see that?

10   A.    Yes.

11   Q.    Okay.

12       What does Ms. Sizemore do?  I know you said that

13   she reports to you.  What is her job?

14   A.    She doesn't report to me.  We work together.

15   Q.    And I think you're right.

16   A.    Yeah.

17   Q.    I misstated your earlier testimony.

18   A.    She enters my purchase orders for me, among other

19   things.

20   Q.    What does Michelle Brotherton do?

21   A.    She works --- her role is to enter the receipts,

22   the goods receipts for the scrap that comes in in this

23   regard.  She has other responsibilities as well.

24   Q.    Okay.

25       Is this a purchase order for trial tolling, or is

Page 76

1    this --- are we beyond the trial stage at this point?

2

3    A.    We're beyond the trial.

4    Q.    Okay.

5        So you were expecting --- well, were you expecting

6    to deliver 1.5 million pounds of poly 5052 scrap to

7    Faith in June of 2023?

8    A.    Yes.

9    Q.    You then write, I will be working with Liz to

10   craft a contract that will begin in July.

11       Do you see that?

12   A.    Yes.

13   Q.    Who is Liz?

14   A.    Liz Hecker is our in house counsel.

15   Q.    Okay.

16       And she is, in fact, an attorney?

17   A.    To my knowledge, yes.

18   Q.    Okay.

19       In the next email chain --- or excuse me, email up

20   chronologically, Ms. Sizemore on June 22nd writes,

21   please see the toll PO attached.  Let me know if

22   anything needs adjusted.

23       Do you see that?

24   A.    Yes.

25   Q.    Okay.

Page 77

1    I assume, it's not clear here because she ---

2    because this email is in the middle of a chain, but do

3    you recall whether she did, in fact attach a toll PO?

4    A.    Yes, I --- yes, she did.

5    Q.    Okay.

6        And did you send that purchase order to Garey

7    Rittenhouse or Faith Aluminum?

8    A.    I can't find anywhere where I did.

9    Q.    Okay.

10        I am handing you what has been marked as Exhibit

11    P-20.  Take a look at that for me.

12    A.    Yes, I've seen it.

13                        ---

14            (Whereupon, Exhibit P-23, Email Chain,

15              was marked for identification.)

16                        ---

17    BY ATTORNEY WITHERS:

18    Q.    Okay.

19        You're not copied on this email chain, but you

20    said you've seen it before?

21    A.    I meant that I've read this, ---

22    Q.    Okay.

23    A.    --- that you've given me.

24    Q.    Okay.  Okay.

25        I understand that you were not copied on this

Page 83

1    A.    At that time, she was Tabitha's boss.

2    Q.    Do you know what her title was?

3    A.    No, I'm afraid I don't.  She was leading the non-

4    metals procurement department at that time.

5    Q.    Okay.

6          If we look at the email chain on the --- the email

7    chain --- or excuse me, the email dated June 1st, 2023

8    and that's on the page with the number in the bottom

9    right hand corner that ends with 04.  Just let me know

10   when you're there.

11   A.    I'm here.

12   Q.    Okay.

13         The topic of this email is May 2023 topics.  Or

14   excuse me, the subject of this email is May 2023

15   topics.  And if you look at the third line down, do

16   you see where it says might have another contract

17   coming through on the scrap side working a deal with

18   Faith Aluminum, the toll shredder.  Speaking with Liz

19   to see if we can use Real Alloy contract as a starting

20   point.

21         Do you see that?

22   A.    Yes.

23   Q.    Okay.

24         We've talked about Real Alloy and it appears that

25   Constellium had a written contract with Real Alloy.

Page 84

1      Do you know whether that is true or not?

2    A.    That is true.

3    Q.    Have you ever seen that contract?

4    A.    Yes, I have.

5    Q.    Did you negotiate that contract?

6    A.    No, I negotiated the fees.

7    Q.    Okay.

8    A.    But legal negotiated with legal.

9    Q.    Right.  The --- okay, I understand that.

10        And you did not draft that contract?

11   A.    No.

12   Q.    And you did not approve that contract?

13   A.    No.

14   Q.    Okay.

15        If we move a page forward, so the page with the

16   last two digits in the bottom right hand corner 03.

17   A.    I'm on that page.

18   Q.    This is an email dated July 3rd, 2023, the subject

19   of which is June 2023 topics.  And if we go to the

20   first line, it says will have another contract coming

21   through on the scrap side working deal with Faith

22   Aluminum, the toll shredder.  Speaking with Liz to see

23   if we can use the Real Alloy contract as a starting

24   point.

25        Do you see that?

Page 85

1    A.    Yes.

2    Q.    The only difference between that and what we

3    looked at in the June 1st email discussing the May 23

4    --- excuse me, May 2023 topics is that the word might

5    has changed to the word will.  Do you see that?

6    A.    Yes.

7    Q.    What, if anything, happened between June 1st, 2023

8    and July 3rd, 2023 that would suggest that rather than

9    a contract with Faith being a mere possibility, might

10   have a new contract --- have a contract to becoming

11   more definite where it says will have another

12   contract?

13         ATTORNEY MEADOWS:

14         Object to the form.

15         THE WITNESS:

16         Yeah, I can't speak to what Tabitha's

17   choice of words would be.

18   BY ATTORNEY WITHERS:

19   Q.    Sure.  Do you know whether --- based on your

20   experience, do you know whether between June 1st, 2023

21   and July 3rd, 2023, the prospect of a contract between

22   Faith and Constellium became more likely to happen

23   over that period of time?

24   A.    We delivered a million and some odd pounds in June

25   to Faith.

Page 86

1   Q.   Okay.

2        If we move forward to the next page with the last

3   two digits, 02 in the bottom right hand corner, it's

4   an email dated August 1st, 2023, the subject of which

5   is July 2023, top picks.

6        Do you see that?

7   A.   Yes.

8   Q.   Okay.

9        So, dropping down below the first paragraph that

10  begins with the phrase or the words demurrage charges,

11  the next pair of --- will have another contract coming

12  through on the scrap side, working a deal with Faith

13  Aluminum, the toll shredder.  Speaking with Liz to see

14  if we can use the Real Alloy contract as a starting

15  point, parentheses, no change.

16       Do you see that?

17  A.   Yes.

18  Q.   To your knowledge, had there been any change in

19  the status of whether there would be a long term

20  contract between Faith and Constellium between July

21  3rd, 2023 and August 1st, 2023?

22  A.   No.

23  Q.   You believe that it was still likely to happen?

24  A.   Yes.

25  Q.   If we move to the next page with the last digits

Page 87

1    01 on the bottom right hand corner, it's an email

2    dated September 1st, 2023, the subject of which is

3    August 2023 topics.

4         Do you see that?

5    A.    Yes.

6    Q.    Okay.

7         If we drop down one, two, three, four, four, five,

8    six lines, do you see where it says will have another

9    contract coming through on the scrap side, working a

10   deal with Faith Aluminum, the toll shredder.  Speaking

11   with Liz to see if we can use the Real Alloy contract

12   as a starting point.  We'll stick with a spot PO for

13   2023 and work towards the contract in 2024.

14        Do you see that?

15   A.    Yes.

16   Q.    What is a spot PO?

17   A.    The POS that we write for a month worth of

18   capacity.

19   Q.    Okay.

20   A.    Or it could also be an established PO that had a

21   line added to it for that month's capacity.

22   Q.    Okay.

23        Is there any significant difference between a spot

24   PO and a regular PO?

25   A.    No.

Page 88

1    Q.    Do you know why Constellium elected to stick with
2    a spot PO for 2023 and work towards a contract in
3    2024? Was it those issues we were talking about
4    earlier with the volatility of the markets and so
5    forth?
6    A.    Yes.
7    Q.    Was it common for Constellium to use spot POs
8    rather than formal contracts?
9    A.    Yes.
10   Q.    Did you have any discussions with Garey
11   Rittenhouse or anybody else at Faith Aluminum about
12   using a spot PO instead of a contract for the tolling
13   services that Faith performed in 2023?
14   A.    Yes.
15   Q.    Tell me about those discussions.
16   A.    I talked to Garey about just continuing using the
17   POs until we could settle everything as far as what to
18   expect from a program under the circumstances that
19   were existing in the market at the time.  He agreed
20   that we would just continue to do the business, keep
21   the business running, and that as we went into 2024,
22   we would approach that with something more solid.
23   Q.    Okay.
24       If we move a page forward in this chain, there's
25   an email dated October 2nd, 2023, the subject of which

Page 91

1    A.    Yes.

2    Q.    Just so it's clear, yes, there had been no change?

3    A.    Yes, there had been no change.

4    Q.    Thank you.  I know sometimes the way I ask a

5    question leads you to give answer that makes the

6    record unclear.  And that's on me.

7         At least as of November 1st, 2023, was it your

8    personal expectation that Faith and Constellium would

9    in fact enter into a --- or would at least still

10   planning to work towards a contract in 2024?

11   A.    Yes.

12   Q.    In your discussions with Garey Rittenhouse and/or

13   Faith Aluminum, was there ever any discussion that

14   Faith would require a commitment from Constellium to

15   deliver minimum monthly volumes of scrap?

16   A.    That came up in discussions, but I rejected that

17   as a proposal.

18   Q.    Okay.

19        Tell me about those discussions.

20   A.    We talked about pricing minimums, maximums. And my

21   position always was and always is with tolling

22   contracts, I just need to know how much you can

23   reserve for us.  How much capacity will you give us?

24   And I will endeavor to buy to that capacity, but I

25   never promise that I will hit that capacity every

Page 92

1    month.   That's a fool's game.

2    Q.    I'm handing you what has been marked as Exhibit P-

3    11.  Let me know when you've had a chance to look at

4    that.

5    A.    Yes, I've looked at it.

6                              ---

7              (Whereupon, Exhibit P-11, Email Chain,

8              was marked for identification.)

9                              ---

10   BY ATTORNEY WITHERS:

11   Q.    Okay.

12       This just appears to be another iteration of an

13   email --- well, let me stop there.  This is an email

14   dated May 19th, 2023, from Mr. Rittenhouse to you.

15       Correct?

16   A.    Yes.

17   Q.    And he's providing a tolling quote to you.

18       Correct?

19   A.    Yes.

20   Q.    And this is the same email that we've seen in

21   several of the previous exhibits from which you cut

22   and pasted and sent --- pasted into your email to

23   Buddy Stemple, Exhibit P-4.

24       Right?

25   A.    Yes.

1     pounds a month for you, and I can do up to a million

2     for you.  That's the capacity I have to sell right

3     now. And so, for me, when I'm looking at a supply of

4     material, it's very important that I know what's the

5     minimum that he can do.  Because if I buy a million

6     pounds and he can only do 700,000, I'm stuck with

7     300,000 pounds of material I can't use.  And in

8     particular, in a situation like this where the scrap

9     is not acceptable to go directly to Ravenswood and I

10    cannot toll convert it in a furnace, my only option is

11    to shred it, I need to know what's the minimum you'll

12    run in a month for me so I don't over buy.  And that's

13    what this is to me.  This is him telling me that we

14    had that conversation directly.

15        We also had conversations about how they were

16    going to run the material and how they were going to

17    make it available to us.  And in those conversations,

18    he said they were going to run it on a campaign which

19    is, you know, a continuous --- as he describes in

20    here, in a continuous, you know, production run.  We

21    call that campaigning.  And he described to me that

22    they could do a one week campaign, and that was their

23    intention, was that they were going to run their 3x

24    product and then run my 5052 with poly one week a

25    month.  And in that week he could run a million

Page 101

1   Q.    Okay.

2         Do those --- well, the PO that you had with

3   United, did you have a PO with United for this scrap

4   that --- it says here the only shortcoming with the

5   United is they can only commit to 700k per month.

6         Did you have a PO for that with them?

7   A.    Yes.

8   Q.    And were they required to deliver a minimum amount

9   of scrap to you each month?

10  A.    No, we don't hold them to the minimums, especially

11  in cases where those --- the source of that is an

12  industrial source.  We can't make Morgan Olson build

13  trucks.  So if Morgan Olson's business goes down,

14  United's take on that business goes down and our take

15  from United goes down.

16  Q.    So you guys don't enter into purchase ---

17  Constellium does not enter into purchase orders with

18  its suppliers of scrap that require the supplier to

19  deliver a minimum amount of scrap per month?

20  A.    We have --- when we write our POS for scrap, we go

21  to great lengths to understand what the volume is

22  going to be, and we try to hit that number.  So if I

23  write a PO for 40,000 pounds, one truckload, or if I

24  write it for 400,000 pounds, ten truckloads, I need to

25  make sure that I'm vetting that with the supplier that

Page 102

1      that's an achievable number.

2          It is not in Constellium's interest to put POs on

3      the books that don't represent the available amount of

4      scrap that will reasonably deliver in the period of

5      that PO.  So we do have discussions about what we'll

6      deliver.  That can be described as a minimum on a PO

7      that we will accept.  We have no way to enforce it.

8      If it isn't there, if they can't get it, they can't

9      get it.  It's all folded into the risk of purchasing

10     scrap metal.

11     Q.    Ultimately, what agreement did you reach with

12     Garey Rittenhouse and Faith Aluminum regarding the

13     processing of scrap alloy for the remainder of 2023?

14     A.    I'm sorry, I don't understand.

15     Q.    Sure.  Did you have --- did Constellium have an

16     agreement with Faith Aluminum regarding the processing

17     of scrap for 2023, the remainder of 2023?

18     A.    From May?

19     Q.    From --- well, from at any point in time to the

20     end of 2023.

21     A.    We had PO for a million pounds a month.

22     Q.    Okay.

23         Starting when?

24     A.    Presumably June.

25     Q.    Going ---?

Page 103

1    A.    No.   And I don't remember exactly.

2    Q.    That's fine.

3    A.    But the first PO represented that large surge, so

4    it was 1.5 million pounds.  But thereafter we settled

5    in at a million pounds a month.

6    Q.    Okay.

7          And that was through the end of 2023?

8    A.    Yes.  And that would have been accomplished by

9    adding lines to an existing PO number that you saw

10   described by Michelle to Kim.

11   Q.    So Constellium never committed to delivering a

12   total minimum volume of scrap alloy during that

13   period?

14   A.    No.  I did not.

15   Q.    Do you know whether anybody else at Constellium

16   did.

17   A.    Nobody else could have.

18   Q.    Was there ever any discussion between you and

19   Garey Rittenhouse or Faith Aluminum that during 2023,

20   Constellium forecasted they could deliver 9.1 million

21   pounds of scrap to Faith Aluminum for processing?

22   A.    Again, please, can you repeat that?

23   Q.    I'll try.  Did you ever have any conversations,

24   communications Garey Rittenhouse or anybody else at

25   Faith Aluminum, where you forecasted that Constellium

Page 104

1   could deliver 9.1 million pounds of scrap alloy by the
2   end of 2023?
3   A.    I would say the answer to that is no,
4   specifically.
5   Q.    Okay.
6   A.    What we talked about was the available monthly
7   volumes.
8   Q.    What were the available monthly volumes --- is
9   that the million pounds you mentioned after the
10  initial 1.5 million pounds?
11  A.    Yes.  And always in my conversations with Garey,
12  we talked about the availability to the point where
13  Garey was even out in the market looking for scrap
14  units that we could contribute to the process.
15  Q.    What was the tolling price per pound on which the
16  parties agreed for 2023?
17  A.    Seventeen (17).
18  Q.    And that would not vary depending on the volume of
19  scrap alloy that Constellium delivered.
20       Right?
21  A.    Right.  We can --- we could only have a fixed
22  price.
23           ATTORNEY WITHERS:
24           It's almost 12:30.  You guys want to
25  take a break or?

1    true up any volume discrepancies at a later date?

2    A.    No, my understanding was they were being flexible

3    because they understood the nature of the supply of

4    the material.  They portrayed themselves as industry,

5    you know, veterans who knew these things.

6    Q.    You then say the deal pivots on the availability

7    of high quality clean bare poly 5052 scrap, the

8    foundation of which is a PO with United Scrap Metals

9    out of Cicero, Illinois.

10        So when you said the deal pivots on the

11    availability of this material, did that mean that

12    Constellium was only obligated to provide up to a

13    million pounds of scrap per month to Faith to process

14    if Constellium could first obtain that volume from its

15    suppliers?

16              ATTORNEY MEADOWS:

17              Objection to the form.

18              THE WITNESS:

19              Yeah, I mean, there --- I couldn't

20    promise to process anything if I couldn't first buy

21    the scrap for it, if that's what the question is.

22    BY ATTORNEY WITHERS:

23    Q.    What conversations, if any, did you have with

24    Garey Rittenhouse about the effect that Constellium

25    was only obligated to provide a million pounds of

1    scrap to Faith if it could first obtain that from its

2    suppliers, if any?

3            ATTORNEY MEADOWS:

4            Object to the form.

5            THE WITNESS:

6            Yeah, I --- that's a --- how would I put

7    this?  I mean, it's an unspoken foundation of any

8    tolling business that you do.  You have to be able to

9    supply the material in order to have a tolling

10   contract.  If United Scrap Metal or any other supplier

11   of the material bows out or sells it somewhere else,

12   you don't have a --- you don't have anything.  You

13   don't have anything to toll.

14   BY ATTORNEY WITHERS:

15   Q.    Further down in that paragraph, it says the scrap

16   is generated at Morgan Olson, a step van truck body

17   manufacturer with whom United has a one year scrap

18   buying agreement.  Since this agreement is subject to

19   renegotiation in early 2024, the actual market wide

20   supply of clean bare poly 5052 was unknown to us.  We

21   have chosen to keep faith on a monthly PO for tolling

22   services until we can establish a longer term three

23   way agreement with United, depending on their success

24   with Morgan Olson, Faith and ourselves.

25           So when you said we've chosen to keep Faith on a

Page 134

1    with the amount of scrap that had been processed.

2    Q.    So you said that you delivered everything that

3    you promised to deliver through the end of that year?

4    A.    Yeah, until December was when I ---.  When he

5    first started hitting me with the --- something to do

6    with the volume.

7    Q.    How much did you promise him that you would

8    deliver?

9    A.    Well, I promised what we talked about, like,

10   every month.  Right.  So we would say, I've got ---

11   I'm going to --- I've got --- let me make an example

12   that's appropriate.  I've got 500,000 pounds coming

13   from Morgan Olson.  I can buy another couple hundred

14   thousand pounds from Kripke and AVEC.  That sort of

15   thing.  That's the nature of the promises of my

16   forecast of what I can put in there and then what

17   actually went in was what actually went in based on

18   the receiving days and that kind of thing.

19   Q.    And so was in December of that year, was the very

20   first time that Garey Rittenhouse ever mentioned to

21   you that Faith was concerned about the volume of

22   scrap that Constellium had delivered?

23   A.    That was when it became a conflict.  We talked

24   about the volumes, we talked about where they were

25   going.  I shared with him that Morgan Olson was

Page 135

1    falling down.  That they were, you know, delivering

2    less and less through United, that they had laid

3    people off and reduced shifts.  I shared all that

4    information with them as it was happening.

5        So throughout that period, you know, in the

6    fourth quarter of 2023, as their business was waning

7    and I was out there trying to buy more metal and

8    struggling at that's when Garey started trying to

9    help me find other metal.  That's when we began to

10   really heavily experiment with other types of scrap

11   that could go in on --- on our PO  And that was how

12   were going about it at that time, but it wasn't until

13   I got contacted in December when he, my words,

14   dropped a bomb on me about having a problem with what

15   we'd already delivered.

16   Q.   Okay.

17       So at no point before December of 2023 did Garey

18   ever discuss with you that he thought it was a

19   problem that Constellium was not delivering as much

20   scrap as Faith expected?

21   A.   That's not how he portrayed it to me.  We talked

22   about scrap volume all the time, and we talked about

23   a desire to keep that scrap volume up, but it wasn't

24   portrayed to me as a problems, you know, like a

25   conflict problem.

Page 186

1    Q.    That's fine.

2    A.    I don't, but that doesn't sound unreasonable.

3    Q.    Are you aware that on April 4th of 2024,

4    Constellium paid Faith $104,437.39 for the scrap

5    alloy that Faith actually processed for Constellium

6    in January of 2024?

7    A.    Yes.

8    Q.    Okay.

9         And I'll represent to you that if you divide

10   $104,437.39 by 0.2931, that results in 356,320

11   pounds, right?  You said that Constellium's payment

12   terms were net 45 days, right?

13   A.    Yes.

14   Q.    Do you know why it took Constellium until April

15   4th of 2024 to remit payment for the scrap that Faith

16   had tolled in January of 2024?

17   A.    I do.

18   Q.    And what is your understanding of that?

19   A.    Faith sent invoices that weren't accurate to the

20   goods receipts reports, and we couldn't match them up

21   and we requested corrected invoices.

22   Q.    And did you ever receive those corrected

23   invoices?

24   A.    We must have in order to make the payment.

25   Q.    Did Constellium deliver any scrap to Faith for

Page 218

1    A.    Yeah, we talked about 700,000 pounds as being a
2    bogey.  That was something that we wanted to have and
3    that, to be specific or to elaborate, right, that's
4    my number.  That's --- I have to do planning on a
5    month-by-month basis for the company to say how many
6    pounds I'm going to put into our SNOP plan.  And so
7    for me, from my standpoint, I want to cover x-amount
8    of pounds of 5052, want to toll x-amount of pounds.
9    I want to buy.  I want to sell.  I have all these
10   things that I'm trying to pull together.  So when I
11   say my target or my goal is 700, that's my goal.
12   That's not some minimum that they establish.  That's
13   my goal.
14   Q.    Your goal was 700,000 pounds a month?
15   A.    That's my self-established goal with the toll.
16   Q.    Do you have any understanding as to the gap that
17   he's trying to close that he refers to?
18   A.    Well, we had talked about what we --- what I
19   already had banked, which was, you know, the United
20   --- the United Scrap Metal.  We talked all the time
21   about what was out there and available to buy.  He
22   was also aware of the market because he was buying,
23   you know, buying scrap or knew --- knew people who
24   had scrap that came to him.  And so were exchanging
25   information and contacts, trying to track down more

Page 219

1    metal.

2         At that period in time, you know, again, we're

3    still just trying to work together to maximize the

4    amount of metal going through.

5    Q.    Let's go to 78.

6    A.    Yes.

7    Q.    Okay.

8         So on January 23rd, top of the page, you say to

9    Garey, got this text from United.  Meanwhile, we are

10   continuing to pull material through to no avail.

11   Morgan Olson way down on --- excuse me, way down with

12   additional layoffs.  So we're at 52 with 5052, with

13   poly, is off.

14        Is this what we were talking about earlier?  That

15   something was going on with Morgan Olson and whatever

16   ---?  Well, what was going on with Morgan Olson?  I

17   know you told me before.  I just can't remember.

18   A.    Their production was continuing to tail off to

19   the point where they eventually laid everybody off in

20   that facility and moved all that production to

21   Michigan.

22   Q.    Which made it --- which negatively impacted

23   Constellium's ability to obtain scrap?

24   A.    In a big way.

25   Q.    Okay.

# Exhibit 2

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2                 FOR THE NORTHERN DISTRICT

3                        OF GEORGIA

4                   *  *  *  *  *  *  *  *

5     FAITH ALUMINUM                    Case No.

6     COMPANY,                          4:24-cv-00151-WMR

7          Plaintiff.

8          vs.

9     CONSTELLIUM ROLLED

10    PRODUCTS RAVENSWOOD,

11    LLC

12         Defendant.

13                *  *  *  *  *  *  *  *

14

15                    DEPOSITION OF

16                    JENNIFER FIFE

17                    April 2, 2025

18

19

20

21

22        Any reproduction of this transcript is

23        prohibited without authorization by the

24               certifying agency.

25

Page 2

1

2                          DEPOSITION

3                              OF

4      JENNIFER FIFE, taken on behalf of the Plaintiff

5      herein, pursuant to the Rules of Civil

6      Procedure, taken before me, the undersigned,

7      Emily Stewart, a Court Reporter and Notary

8      Public in and for the Commonwealth of

9      Pennsylvania, at the offices of Chase Tower,

10     17th Floor, 707 Virginia Street East,

11     Charleston, WV 25301, on Wednesday, April 2,

12     2025, beginning at 12:49 P.M.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 88

```
1    STATE OF WEST VIRGINIA  )
2                       CERTIFICATE
3         I, Emily Stewart, a Notary Public in
4    and for the State of West Virginia, do hereby
5    certify:
6         That the witness whose testimony
7    appears in the foregoing deposition, was duly
8    sworn by me on said date and that the
9    transcribed deposition of said witness is a
10   true record of the testimony given by said
11   witness;
12        That the proceeding is herein recorded
13   fully and accurately;
14        That I am neither attorney nor counsel
15   for, nor related to any of the parties to the
16   action in which these depositions were taken,
17   and further that I am not a relative of any
18   attorney or counsel employed by the parties
19   hereto, or financially interested in this
20   action.
21
22
23                  Emily Stewart,
24                  Court Reporter
25
```

Page 21

1           ATTORNEY WITHERS:
2               I want to say some of the reasons
3       I'm pausing between questions here is I'm
4       seeing what I can skip over.
5           THE WITNESS:
6               Okay.
7               That's fine.
8           ATTORNEY WITHERS:
9               So, --- so, to get you out of
10      here faster.
11      BY ATTORNEY WITHERS:
12      Q.   Do you know if --- if Constellium
13      negotiates with a processor with regard to a
14      certain amount of volume of scrap and
15      Constellium is unable to deliver the forecasted
16      amount of scrap to the processor to process, do
17      you have any understanding of how those parties
18      might resolve any such discrepancy?
19      A.   We don't do take or pay contracts, if
20      that's what you're describing.  We --- we just
21      don't have those type of contracts.
22      Q.   Okay.
23          We'll talk about that in --- in a little
24      bit.
25          To your knowledge, before 2023, had

Page 35

1            --- and if I need to, I will.

2

3            ATTORNEY WITHERS:

4            Okay.

5            You just let me know.

6            THE WITNESS:

7            Okay.

8            ATTORNEY WITHERS:

9            Okay.

10    BY ATTORNEY WITHERS:

11    Q.    So, was it typical --- is it your typical

12    practice that Ms. Sizemore would, on a monthly

13    basis, kind of update you regarding the status

14    of certain matters?

15    A.    Yes.

16    Q.    Okay.

17        If we go to the email beginning on page ---

18    the last digits 04, and there's an email dated

19    June 1st, 2023 from Ms. Sizemore to you, the

20    subject of which is May 2023, topics.

21        Do you see that?

22    A.    Yes.

23    Q.    Okay.

24        If you look down, starting at the third

25    line of the email where it says might have

Page 36

1      another contract coming through on the scrap

2      side, working a deal with Faith Aluminum, the

3      toll shredder, speaking with Liz to see if we

4      can use the Real Alloy contract as a starting

5      point.  Working with IT to get Faith Aluminum

6      Stud up as a storage location, hoping the

7      request will be added in SAP this week as we

8      have a new vendor whose material will be stored

9      there, period.  United Scrap.

10          Do you see that?

11     A.    Yes.

12     Q.    Okay.

13          Do you know who Real Alloy is?

14     A.    Yes.

15     Q.    Who is Real Alloy?

16     A.    They're another subcontractor processor for

17     the plant.

18     Q.    And it would appear from this that

19     Constellium had a written contract with Real

20     Alloy, correct?

21     A.    Correct.

22     Q.    Have you ever seen that contract?

23     A.    I did review it.

24     Q.    Okay.

25          Okay.

Page 37

1      Let's turn a page forward.  We're going to

2  be moving towards the front of the document

3  now.  So, it's page 03, last digits.  This is a

4  July 3rd, 2023 email from Ms. Sizemore to you,

5  subject of which is June 2023 topics.  No

6  changes from last month.

7      If we go down, look at the first two lines,

8  this email, Ms. Sizemore writes, we'll have

9  another contract coming through on the scrap

10  side.  Working a deal with Faith Aluminum, the

11  toll shredder, speaking with Liz to see if we

12  can use the Real Alloy contract as a starting

13  point.

14      You see that?

15  A.    Yes.

16  Q.    If you compare this with the previous page,

17  it appears the only difference between this

18  language and that language is that whereas in

19  the --- the May topics email they say or Ms.

20  Sizemore says might have another contract, in

21  this one she wrote will have another contract.

22      Do you see that?

23  A.    Yes.

24  Q.    Do you know what, if anything happened

25  between June 1st of 2023 and July 3rd of 2023

1    that suggested that rather that --- that ---
2    would have warranted a change of the word might
3    to the word will?
4    A.    I'd have to look at the PO date.  That
5    would be the only thing I would know is if a PO
6    got issued or an email said that, yes, we need
7    to issue a PO, but I don't recall what the date
8    was.
9    Q.    Okay.
10        So, if --- if there had been a PO then you
11   --- would you have expected that there would
12   also necessarily be a written contract?
13   A.    For this service, yes, there should have
14   been.
15   Q.    Okay.
16        Let's move one page forward.  The last two
17   digits on the bottom right hand corner are 02.
18    This is an August 1st, 2023 email from Ms.
19   Sizemore to you, the subject of which is July
20   2023 topics.  If we skip down to the beginning
21   of the second paragraph, Ms. Sizemore writes,
22   will have another contract coming through on
23   the scrap side working a deal with Faith
24   Aluminum, the toll shredder, speaking with Liz
25   to see if we can use Real Alloy contract as a

Page 39

1  starting point.  Parentheses, no change, close
2  paren.
3       Do you see that?
4  A.    Yes.
5  Q.    Would you agree with me that the only
6  difference between what we see in the July 2023
7  topics email and June 2023 topics email, is
8  that parenthetical no change?
9  A.    That's correct.
10  Q.    And I --- I would assume, but I don't want
11  to assume someone ask you, did this mean that
12  there had been no change in the status of
13  drafting a contract with Faith between July
14  3rd, 2023 and August 1st, 2023?
15  A.    Yes.  I'd be speculating her intent, but
16  that is how I read it.
17  Q.    Okay.
18       Let's move a page forward to the page with
19  a 01 at the bottom right hand corner.  This is
20  a email dated September 1st, 2023 from Ms.
21  Sizemore to you, the subject of which is August
22  2023 topics.
23       If we skip down one, two, three, four,
24  five, six --- to the beginning of the seventh
25  line, do you see where it says we'll have

Page 40

1      another contract coming through on scrap side,

2      working a deal with Faith Aluminum, the toll

3      shredder, speaking with Liz to see if we can

4      use the Real Alloy contract as a starting

5      point, we'll stick with a spot PO for 2023 and

6      work towards a contract in 2024.

7           Do you see that?

8      A.    Yes.

9      Q.    Okay.

10          So, really the --- the --- the difference

11     between this and the prior email was instead of

12     no change, it's been replaced with we'll stick

13     with a spot PO for 2023 and work towards a

14     contract in 2024.

15          Would you agree with that?

16     A.    Yes.

17     Q.    What is a spot PO?

18     A.    It's like a --- expected for a one time buy

19     or specific to a particular buy.

20     Q.    Is that different from a --- what I would

21     call a regular PO?

22     A.    No, the difference would be we could have a

23     blanket purchase order versus a spot or a one

24     time buy.

25     Q.    Okay.

Page 41

1       So, would you expect --- if --- if somebody

2   was going --- if --- excuse me.

3       If Constellium was going to hire Faith to

4   process scrap for the months of September,

5   October, November and December, those four

6   months of 2023, would you have expected the use

7   of a spot PO for that?

8   A.    There could be reasons for doing so, a

9   trial or, you know, something like that.  But

10  typically, I would still want a contract to

11  govern that with terms and conditions.

12  Q.    Okay.

13      Do you --- do you happen to know why in

14  this instance Constellium was going to use a

15  spot PO instead of a contract?

16  A.    I do not know.

17  Q.    Okay.

18      Let's --- let's move a page forward.  The

19  last two digits in the bottom right hand corner

20  are 00.

21  A.    Mmhmm.

22  Q.    This is an email dated October 2nd, 2023

23  from Ms. Sizemore to you, subject of which is

24  September 2023 topics.  We skip down to the

25  beginning of the second paragraph.  Ms.

Page 42

1    Sizemore rights will have another contract

2    coming through on the scrap side, working a

3    deal with Faith Aluminum, toll shredder,

4    speaking with Liz to see if we can use the Real

5    Alloy contract as a starting point.  We'll

6    stick with a spot PO for 2023 and work towards

7    a contract in 2024.  Parentheses, no change,

8    close paren.

9        Do you see that?

10   A.    Yes.

11   Q.    Only difference between this and the ---

12   and the previous email is the addition of that

13   parenthetical no change, right?

14   A.    Yes.

15   Q.    I'm sorry?

16   A.    Yes.

17   Q.    I'm sorry --- just sorry if I didn't hear

18   you there.

19       Are you aware of whether there had been any

20   change in connection with the status of

21   formalizing a contract with Faith Aluminum

22   during that month?

23   A.    I do not know.

24   Q.    Okay.

25       And then let's go two pages forward to the

# Exhibit
# 3

Faith Aluminum Company v.          FINAL                April 28, 2025
Constellium Rolled Products                             Muriel Stewart

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION
----------------------------------------------
FAITH ALUMINUM COMPANY,
          Plaintiff,
v.


CONSTELLIUM ROLLED
PRODUCTS RAVENSWOOD, LLC,
          Defendant.


Civil Action File No. 4:24-CV-00151-WMR
----------------------------------------------


DEPOSITION OF
Muriel Stewart
April 28, 2025
Atlanta, Georgia
Lead: John Meadows, Esquire
Firm: Steptoe & Johnson


FINAL COPY
JANE ROSE REPORTING   1-800-825-3341

.

Faith Aluminum Company v.      FINAL                    April 28, 2025
Constellium Rolled Products                             Muriel Stewart

Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiff
        FAITH ALUMINUM COMPANY
        JOHN J. MEADOWS, ESQUIRE
        Steptoe & Johnson, PLLC
        707 Virginia Street East
        Suite 1700
        Charleston, West Virginia 25301

On behalf of the Defendant
        CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC
        C. KNOX WITHERS, ESQUIRE
        Arnall Golden Gregory, LLP
        171 17th Street, NW
        Suite 2100
        Atlanta, Georgia 30363

Also Present
        Steve Stewart

JANE ROSE REPORTING
        74 Fifth Avenue
        New York, New York 10011
        1-800-825-3341
        Lamarra George, Court Reporter
        Elijah Peck, Videographer

.

Faith Aluminum Company v.        **FINAL**                April 28, 2025
Constellium Rolled Products                               Muriel Stewart

Page 54

```
 1              REPORTER DISCLOSURE
 2           The following reporter and firm
            disclosures were presented at this
 3          proceeding for review by counsel:
 4
 5            Jane Rose Reporting represents that
 6          the foregoing transcript as produced by our
 7          Production Coordinators, Georgia Certified
            Notaries, is a true, correct and complete
 8          transcript of the colloquies, questions,
            and answers as submitted by the certified
 9          court reporter in this case.  Jane Rose
10          Reporting further represents that the
11          attached exhibits, if any, are a true,
            correct, and complete copy as submitted by
12          the certified reporter, attorneys, or
13          witness in this case; and that the exhibits
            were handled and produced exclusively
14          through our Production Coordinators,
            Georgia Certified Notaries.  Copies of
15          notarized production certificates related
16          to this proceeding are available upon
            request to Janerose@janerosereporting.com.
17          Jane Rose Reporting is not taking this
            deposition under any relationship that is
18          prohibited by OCGA 15-14-37(a)and(b).
            Case-specific discounts are automatically
19          applied to all parties, at such time as any
            party receives a discount.  Ancillary
20          services such as calendar and financial
            reports are available to all
21          parties upon request.
22
23                         Lamarra George, CCR-2582
24                         April 28, 2025
25
```

Faith Aluminum Company v.        **FINAL**                    April 28, 2025
Constellium Rolled Products                                   Muriel Stewart

```
                                                   Page 55
 1                 C E R T I F I C A T E
 2     STATE OF GEORGIA
 3     COUNTY OF FULTON
 4
 5              I, Lamarra George, hereby certify
 6          that the foregoing transcript was taken
 7          down, as stated in the caption, and the
 8          questions and answers thereto were reduced
 9          to typewriting under my direction; that the
10          foregoing pages represent a true, complete,
11          and correct transcript of the evidence
12          given upon said hearing, and I further
13          certify that I am not of kin or counsel to
14          the parties in the case; am not in the
15          regular employ of counsel for any of said
16          parties; nor am I in any way interested in
17          the result of said case.
18              This, the 1st day of May 2025.
19
20          _____
21          Lamarra George, RPR, CSR
22          GA. CCR-2582
23          My commission expires on
24          the 31st of March 2026.
25
```

Faith Aluminum Company v.    FINAL                    April 28, 2025
Constellium Rolled Products                          Muriel Stewart

```
                                                      Page 13
 1    construction, and demolition.  Was there a period of
 2    time in there that you didn't work?
 3           A.    No.
 4           Q.    Are you certified by the State of Georgia
 5    or any other licensing agency for any of those
 6    categories for which you perform work?
 7           A.    No.  I worked in the office for all of
 8    those companies.  I didn't do, like, trade work.
 9           Q.    You weren't the plumber or --
10           A.    No.
11           Q.    -- a contractor or running a forklift.  I
12    got you.
13                 What is your background with Garey
14    Rittenhouse?
15           A.    I know him as a friend.
16           Q.    How long have you known him?
17           A.    Probably back from 2016, is when I first
18    met him.
19           Q.    Before May of last year, that's May of
20    2024 --
21           A.    Uh-huh.
22           Q.    -- did you talk with Garey about Faith
23    suing Constellium?
24           A.    No, I never talked with Garey about it.
25           Q.    Since May --
```

Faith Aluminum Company v.     **FINAL**              April 28, 2025
Constellium Rolled Products                          Muriel Stewart

Page 14

```
 1         A.    I don't recall.
 2         Q.    I know, I've -- because I asked -- I put
 3    the day --
 4         A.    Yeah, that --
 5         Q.    Have you talked with Garey about --
 6         A.    That I can recall --
 7         Q.    -- it since then.
 8         A.    -- yes.  Not me personally, no.
 9         Q.    Okay.  So as near as you can recall, you
10    haven't communicated --
11         A.    No.
12         Q.    -- with Garey about it?
13               What is your position with Faith Aluminum
14    Company?
15         A.    I was the owner of the company up until
16    December 2023.
17         Q.    And is it -- should we be using the past
18    tense to refer to Faith now?
19         A.    Yes.
20         Q.    I put it in presence tense, but is -- is
21    it gone?  Does it --
22         A.    It's gone.
23         Q.    Okay.  And that's December of '23?
24         A.    '23.
25         Q.    You were the owner.
```

Faith Aluminum Company v.    FINAL                April 28, 2025
Constellium Rolled Products                      Muriel Stewart

Page 17

1        Q.    Did you discuss them with him before he
2   signed them?
3        A.    Not particulars of them.  He would -- you
4   know, I'd tell him it's here, he would look at it, he
5   would sign it.
6        Q.    Did you ever engage in any contracts at
7   all --
8        A.    No.
9        Q.    -- without run it by Steve or talking to
10  Steve?
11       A.    No.  No.
12       Q.    Are -- when the company existed, did you
13  make operational decisions or was Steve making
14  operational decisions?
15       A.    I would say we made them together.
16       Q.    He didn't make all of them, and you --
17       A.    He --
18       Q.    -- didn't make all of them?
19       A.    He made the majority of them.  If had to
20  do with, like, office staff or something, I made
21  them.  But if it was company operations, then Steve
22  made them.
23       Q.    So what is the creation time for Faith
24  Aluminum Company?
25       A.    We owned a scrap yard that we sold in

.

Faith Aluminum Company v.     **FINAL**                April 28, 2025
Constellium Rolled Products                             Muriel Stewart

```
                                              Page 18
 1   2019, and we started Faith Aluminum Company in
 2   Rockmart at that time.  We kept that part of the
 3   business and kept that going.
 4        Q.    For the benefit of the record, what was
 5   the name of that original scrap yard business?
 6        A.    Marietta Recycling Corp.
 7        Q.    Now I --
 8        A.    And that didn't have anything to do with
 9   Faith Aluminum, it's just what we were doing prior.
10        Q.    Was Marietta Recycling Corp also known by
11   its initials MRC?
12        A.    Yes.
13        Q.    Is MRC, Marietta Recycling Corp, in any
14   way associated with the MRC Electronics Recyclers
15   that operated today in the U.S.?
16        A.    No.
17        Q.    That's just a coincidence of --
18        A.    Yeah.  Sorry.  Doing the --
19        Q.    No.
20        A.    -- nod.
21        Q.    You did good.
22        A.    Apparently I don't know.  I've never heard
23   of that company, so I don't know.
24        Q.    But your Marietta Recycling Corporation
25   was not an e-recycling?
```

Page 24

```
 1        Q.    I understand.
 2              When did you become aware that Faith was
 3   going to toll or process poly 5052 for Constellium?
 4        A.    I couldn't tell you any exact date, but I
 5   think they did the test -- it's kind of hearsay.  I'm
 6   going to say it was around June of 2023.
 7        Q.    And what's your understanding about what
 8   they were doing?
 9        A.    Constellium was going to provide the
10   material, we processed it, and then sent it back to
11   them.
12        Q.    Had you done work with Constellium before?
13        A.    I don't know.  I was not involved in the
14   day-to-day stuff, so I didn't.
15        Q.    Who would know?
16        A.    Kim, Steve.
17        Q.    Did you -- had you -- had you spent any
18   time understanding the technical aspects of the
19   shredder that you were going to use for poly --
20        A.    Lord, no.
21        Q.    -- 5052.
22              What did you understand Garey Rittenhouse's
23   role would be in your interaction with Constellium?
24        A.    He was the contact person.  Garey had
25   contacts all over the industry, and he made the
```

.

Faith Aluminum Company v.    **FINAL**          April 28, 2025
Constellium Rolled Products                         Muriel Stewart

```
                                             Page 25
 1    contacts.  And he and Steve would decide on what they
 2    wanted to do, and Steve always had the final say.
 3         Q.    Had you ever done business with Garey
 4    before?
 5         A.    Yeah.
 6         Q.    What kind of business?
 7         A.    As for making contacts with where to sell
 8    the material that we processed before we started --
 9    before we started with Constellium, we were -- we
10    processed for multiple people.  And Garey made those
11    contacts.
12         Q.    How was he paid, Garey Rittenhouse?
13         A.    I don't know exactly.  I know he -- he got
14    a fee.
15         Q.    Who --
16         A.    I don't know how it was --
17         Q.    Let me ask it --
18         A.    -- about --
19         Q.    -- this way.
20               If y'all were using Garey to facilitate a
21    deal, were you paying Garey or were the other people
22    paying Garey; do you know?
23         A.    We were.
24         Q.    You were.
25               Are you aware of any other agreements that
```

Faith Aluminum Company v.    FINAL                    April 28, 2025
Constellium Rolled Products                          Muriel Stewart

Page 26

1    Garey would have brought in that involved tolling
2    scrap aluminum?
3         A.    Not to my knowledge.  Like I said, I was
4    not involved in the day to day.  I didn't keep up
5    with all of that.
6         Q.    I know that some of the paperwork that you
7    processed internally had to do with agreements and
8    insurance; you told me that earlier today.  How about
9    vendor setups, would you have done vendor setup
10   documents?
11        A.    No.  Kim did that.
12        Q.    I'm going to show you an exhibit.  I know
13   you've been waiting eagerly for this part of it to
14   begin.  And here we go.  I'm going to pass you what
15   I've marked as Exhibit No. 32, Defendant's Exhibit
16   32.
17             (Exhibit No. 32 was marked for
18        identification.)
19        Q.    (By Mr. Meadows) And Mrs. Stewart, what I
20   passed over to you is marked as Defendant's 32.  The
21   little numbers on the bottom right, you see them,
22   this one goes from 727 to 729.  I'll give you a
23   minute to look it over.
24        A.    Uh-huh.  Okay.
25        Q.    Do you recognize what I've handed to you?

Faith Aluminum Company v.       FINAL          April 28, 2025
Constellium Rolled Products                    Muriel Stewart

```
                                                    Page 31
 1          Q.    So, this e-mail does confirm that banking
 2    information that we just talked about --
 3          A.    Uh-huh.
 4          Q.    -- from number 33, right?
 5          A.    Yes.
 6          Q.    Did Faith authorize Garey to send this
 7    response?
 8          A.    I would assume so.  I don't know.  Because
 9    that would have been something -- I wouldn't have
10    been a part of this, so I don't know.
11          Q.    And if I can take you to the first
12    paragraph, the last end of that first sentence it
13    says that, Please consider this e-mail to be
14    confirmation of our interest to share the banking
15    information for Faith Aluminum, so Constellium may
16    remit payment for tolling services rendered.
17          A.    Uh-huh.
18          Q.    Do you see those words?
19          A.    Yes.
20          Q.    And based on your reading of this today,
21    Garey was not asking for anyone to pay for anything
22    other than tolling services rendered?
23          A.    I --
24                MR. WITHERS:  Object to form.
25          Q.    (By Mr. Meadows) Isn't that right?
```

# Exhibit 4

.

```
                                                    Page 1
    IN THE UNITED STATES DISTRICT COURT
    FOR THE NORTHERN DISTRICT OF GEORGIA
    ROME DIVISION
    ---------------------------------------------
    FAITH ALUMINUM COMPANY,
             Plaintiff,
    v.

    CONSTELLIUM ROLLED
    PRODUCTS RAVENSWOOD, LLC,
             Defendant.

    Civil Action File No. 4:24-CV-00151-WMR
    ---------------------------------------------


    DEPOSITION OF
    Steve Stewart, Volume 1
    April 28, 2025
    Atlanta, Georgia
    Lead: John Meadows, Esquire
    Firm: Steptoe & Johnson


    FINAL COPY
    JANE ROSE REPORTING  1-800-825-3341
```

.

Faith Aluminum Company v.    **FINAL**    April 28, 2025
Constellium Rolled Products                Steve Stewart, Vol. 1

Page 2

APPEARANCES OF COUNSEL

On behalf of the Plaintiff
        FAITH ALUMINUM COMPANY
        JOHN J. MEADOWS, ESQUIRE
        Steptoe & Johnson, PLLC
        707 Virginia Street East
        Suite 1700
        Charleston, West Virginia 25301

On behalf of the Defendant
        CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC
        C. KNOX WITHERS, ESQUIRE
        Arnall Golden Gregory, LLP
        171 17th Street, NW
        Suite 2100
        Atlanta, Georgia 30363

Also Present
        Muriel Stewart

JANE ROSE REPORTING
        74 Fifth Avenue
        New York, New York 10011
        1-800-825-3341
        Lamarra George, Court Reporter
        Elijah Peck, Videographer

Faith Aluminum Company v.     **FINAL**                    April 28, 2025
Constellium Rolled Products                        Steve Stewart, Vol. 1

```
                                                    Page 69
     1                   REPORTER DISCLOSURE
                      The following reporter and firm
     2            disclosures were presented at this
     3            proceeding for review by counsel:
     4

     5                 Jane Rose Reporting represents that
                  the foregoing transcript as produced by our
                  Production Coordinators, Georgia Certified
     6            Notaries, is a true, correct and complete
     7            transcript of the colloquies, questions,
                  and answers as submitted by the certified
     8            court reporter in this case.  Jane Rose
     9            Reporting further represents that the
                  attached exhibits, if any, are a true,
    10            correct, and complete copy as submitted by
    11            the certified reporter, attorneys, or
                  witness in this case; and that the exhibits
    12            were handled and produced exclusively
                  through our Production Coordinators,
    13            Georgia Certified Notaries.  Copies of
                  notarized production certificates related
    14            to this proceeding are available upon
                  request to support@huseby.com.
    15            Jane Rose Reporting is not taking this
    16            deposition under any relationship that is
                  prohibited by OCGA 15-14-37(a)and(b).
    17            Case-specific discounts are automatically
    18            applied to all parties, at such time as any
    19            party receives a discount.  Ancillary
    20            services such as calendar and financial
    21            reports are available to all
    22            parties upon request.
    23
    24                              Lamarra George, CCR-2582
    25                              April 28, 2025
```

```
                                                    Page 70
  1
  2                    C E R T I F I C A T E
  3    STATE OF GEORGIA
  4    COUNTY OF FULTON
  5
  6              I, Lamarra George, hereby certify
  7         that the foregoing transcript was taken
  8         down, as stated in the caption, and the
  9         questions and answers thereto were reduced
 10         to typewriting under my direction; that the
 11         foregoing pages represent a true, complete,
 12         and correct transcript of the evidence
 13         given upon said hearing, and I further
 14         certify that I am not of kin or counsel to
 15         the parties in the case; am not in the
 16         regular employ of counsel for any of said
 17         parties; nor am I in any way interested in
 18         the result of said case.
 19              This, the 28th day of April 2025.
 20
 21                          _____
 22                          Lamarra George, CCR-2582
 23                          My commission expires on
 24                          the 31st of March 2026.
 25
```

```
                                                      Page 20
 1          A.    Well, we've got -- yeah.  I --
 2          Q.    I'm sorry.
 3          A.    Ima is -- probably the secretary of that
 4     and she's the president.  But --
 5          Q.    Oh, okay.  I'm sorry.  I -- I may have
 6     misunderstood you.  It's okay, though.  Okay.
 7                With Faith Aluminum -- and I -- again, I
 8     know we talked about some of this stuff about your
 9     wife, but it's really important that we get -- I may
10     be asking questions that she's already answered but
11     it's because I haven't asked you.
12                Who were the other officers of Faith?
13          A.    None.
14          Q.    Other than you and your wife.
15          A.    Right.
16          Q.    And who were the owners of Faith?
17          A.    Me and my wife.
18          Q.    And were there ever any other owners?
19          A.    No.
20          Q.    Is it fair to say you made the operational
21     decisions for Faith?
22          A.    Yes.
23          Q.    Did you sign every contract Faith entered?
24          A.    Yes.
25          Q.    Did Muriel, your wife, did she ever sign
```

Page 22

```
 1   non W-2 employees?
 2        A.    I paid him by the -- a percentage of the
 3   material that we shipped out.
 4        Q.    And in the end of the year, you'd issue
 5   him a tax form for his consulting fees?
 6        A.    My office did it, so I'm sure they did.
 7        Q.    Am I right that his company's name is
 8   Regional Metal Services?  Does that sound right to
 9   you?
10        A.    Yes.
11        Q.    Did you ever own any part of Regional
12   Metal Services?
13        A.    No.
14        Q.    Do you know if anybody, other than Garey
15   Rittenhouse, ever owned any part --
16        A.    I have no idea.
17        Q.    -- of Regional Metal Services?
18              You'd agree with me, Garey Rittenhouse is
19   not a party to this lawsuit?
20        A.    Yes, he is.
21              I mean, what -- what -- hang on.  You got
22   to explain it to -- explain the question.
23        Q.    I'm sorry.  Garey -- Garey Rittenhouse is
24   not one of those people who is suing Constellium
25   Ravenswood?
```

Faith Aluminum Company v.    FINAL                    April 28, 2025
Constellium Rolled Products                    Steve Stewart, Vol. 1

Page 23

```
 1         A.    No.  No.
 2         Q.    And Con- -- he's not -- he's not listed on
 3    the style of the case at the beginning?  It's --
 4         A.    Right.  I misunderstood your question.
 5         Q.    I'm with you.
 6               And you said -- because I asked this
 7    twice -- I said who was entering them?  You said
 8    Garey.  You said your wife.  Is there anyone else,
 9    besides your wife or Garey, that might have been able
10    to enter contracts for Faith?
11         A.    No.
12         Q.    Or who could speak for Faith in this
13    lawsuit?  That was actually the original question.
14    I'm apologize.  It wasn't contracts.
15               Is there anybody, other than Garey or your
16    wife or you, who could speak for Faith in this
17    lawsuit?
18         A.    Not that I know.
19         Q.    Well, would anybody know other than you?
20         A.    Yeah, I would assume I would know, but...
21         Q.    Okay.  So let's talk a minute.
22               Who's Kim Watson.
23         A.    She's an employee.
24         Q.    How long have you known her?
25         A.    Now, probably close to 20 years.
```

```
                                                Page 30
    1          A.     That I can remember.
    2          Q.     Do -- do you -- and I know you've --
    3    you've said you don't remember fully.  Were you
    4    trying to borrow money?  Was this document part of an
    5    effort to borrow money for Faith?
    6          A.     No.  We don't need to borrow money for
    7    Faith.
    8          Q.     This document has financial performance
    9    information in it.  I'm sorry.  I think I've already
   10    asked the question I was going to ask with that.
   11          A.     No.  You -- you -- maybe -- we bought a
   12    shredder in '21 or '22.  I think we bought it in '21,
   13    end of '21.  And we did finance a million dollars on
   14    that shredder, but I don't -- I don't remember doing
   15    this document.  I don't ever remember seeing it, so.
   16    That's the only thing we ever financed out there, and
   17    we paid it off a year later.
   18          Q.     I understand.  So Faith's business --
   19    we're going to talk about '22, 2020 -- beginning,
   20    right?  It's -- 2019, you started ^ by ^ about 2020.
   21    Faith is buying scrap, toiling it, and selling the
   22    resulting product?
   23          A.     Correct.
   24          Q.     And you called your product 3X aluminum
   25    alloy?
```

Page 31

 1        A.    Yes.
 2        Q.    And is that an -- that's any 3000 series
 3    alloy?
 4        A.    Well, it's a mixture of different alloys
 5    that would end up to form a 3000 series alloy.
 6        Q.    If I said it was specifically 3104 and
 7    3003, would that sound right to you about what types
 8    of aluminum it was?
 9        A.    That's what it ended up once it went
10    through the X-rays.
11        Q.    Got it.  And this was a traditional
12    buy-sell model; is that right?
13        A.    Yes, it was.
14        Q.    Now, this document, this summary said you
15    could produce a 5X or 6X, according to this.  These
16    were options here, 5X product to 6X product, but you
17    weren't doing that; is that right?
18        A.    Correct.
19        Q.    Why not?
20        A.    There was -- the X-rays that we had at the
21    time, they would do it but they wouldn't do it -- a
22    good enough job as they what they did with a 3X
23    product.
24        Q.    And then by the time we get to here in
25    2022, you are not toiling anything, right?

Faith Aluminum Company v.   **FINAL**         April 28, 2025
Constellium Rolled Products                   Steve Stewart, Vol. 1

```
                                                   Page 32
 1          A.    We were still -- no.  We never toiled
 2    anything up until the facility.
 3          Q.    This isn't a toiling services -- this
 4    doesn't express that you're doing toiling services,
 5    right?
 6          A.    Right, you just said toil.
 7          Q.    I promise I'm not trying to trip you up.
 8    I may -- if I said it backwards, then I -- I
 9    apologize.  But, yes, I'm just trying to clarify that
10    there's no toiling -- this is -- this Defendant's
11    Exhibit 1, your executive summary, does not represent
12    that you have a toiling business?
13          A.    Right.  Correct.
14          Q.    And that's 2022.  When did you begin to
15    offer toiling?
16          A.    We started exploring it in probably May of
17    '23 with Constellium.
18          Q.    Why were you interested in trying out
19    toiling?
20          A.    Because the 3X market, just like every
21    other market in the scrap business, was controlled by
22    big aluminum companies, and they'd beat the price
23    down so bad that you couldn't make money on it.  So
24    we were looking for something else to keep our
25    employees working.
```

Faith Aluminum Company v.    FINAL                        April 28, 2025
Constellium Rolled Products                         Steve Stewart, Vol. 1

```
                                                    Page 33
  1        Q.    And so that was the 3X series, right, or
  2   was it all of the different processors?
  3        A.    The 3X --
  4        Q.    The 3X?
  5        A.    -- product.
  6        Q.    Now, you -- but you could have done -- you
  7   did buy equipment to process 5X?
  8        A.    No.
  9        Q.    No.  Okay.
 10              You could have if this executive -- the
 11   executive summary has it on here, but at that time,
 12   you couldn't have done it; is that right?
 13        A.    Correct.  We could have done it, but it
 14   would not have been a -- a good product, as -- as the
 15   3X product.
 16        Q.    Got it.  Okay.
 17              How did you -- well, did you buy a
 18   processor that could toil poly 50 -- 5X?
 19        A.    No, we didn't have to.  It was a -- it was
 20   a pure alloy coming to us.  We were getting the
 21   plastic off of it.  It was supposed to be a pure
 22   alloy, let's say that.
 23        Q.    And it's difficult to get all that coating
 24   off, right?
 25        A.    Very difficult.
```

```
                                                    Page 34
 1          Q.    And that's what your rasper was able to
 2     do?
 3          A.    Correct.
 4          Q.    When did you learn how to get the coating
 5     off?
 6          A.    Because I'm just that kind of guy.  I can
 7     figure that stuff out.
 8          Q.    No.  No, I'm sorry.  When?
 9          A.    When.
10          Q.    Yes, sir.
11          A.    Oh, May of 2024, 2023.
12          Q.    So you had to learn it as you were trying
13     to develop your understanding of the coated
14     aluminum --
15          A.    Correct.
16          Q.    -- processing?
17          A.    We took four trial loads and learned how
18     to do it.
19          Q.    In 2023 where -- where was poly 5052 scrap
20     coming from?  Do you know?
21          A.    It was coming from Constellium, but my
22     understanding was it had came back from processors
23     that they had sold it to, and then they had scrap
24     yards that either bought it or processed it for them
25     and then shipped it to us.
```

Faith Aluminum Company v.      **FINAL**               April 28, 2025
Constellium Rolled Products                        Steve Stewart, Vol. 1

Page 35

1         Q.    Did you ever make a determination about
2    how much 5052 scrap was available?
3         A.    Never did.  It was not my job to do.
4         Q.    Did you continue to process 3X in 2023 to
5    sell finished product after May?
6         A.    No, we did not.  We had product in
7    inventory that we sold in January of 2024.
8         Q.    So it was all gone by the time they came?
9         A.    Excuse me?
10        Q.    Did you say 2023 or 2024?  I'm sorry.
11        A.    We had bought it in early 2023 and
12   processed it.  And we sold it when we shut down the
13   business in 2024, January of 2024.
14        Q.    Thank you.
15        A.    Because it was actually a market for it
16   again.
17        Q.    Do you know if there's a market for it
18   now?
19        A.    It's -- now it's booming, yeah.
20        Q.    Would your business be booming if you had
21   stayed in?
22        A.    No, because we probably wouldn't have made
23   it.
24        Q.    Would you agree the Constellium paid Faith
25   for every pound of poly 5052 that you processed for

Page 47

1   and then we verify it and talk about it and say yes,
2   no...
3          Q.     So you believe that if in July of 2023
4   Constellium couldn't find any more poly to send to
5   you that they still needed to pay you for 1.3 million
6   pounds each month through the end of the year?
7          A.     That's what they agreed to do.
8          Q.     Can you show me an e-mail, can you show me
9   a record of call between Garey and Sean that they're
10  -- they agreed to do just that?
11              MR. WITHERS:  Object to form.
12              THE WITNESS:  I don't know.  You'd
13         have to talk to Mr. Rittenhouse.
14         Q.     (By Mr. Meadows) We talked about the 1.3
15  and the 1 million.  The 1 million you would contend
16  comes from the December communication, which you say
17  gave a different amount for guaranteed processing
18  through the first part of 2024; is that right?
19         A.     The million was supposed to be for all of
20  2024, but the first four months, it would be at a
21  higher price to make up for the shortfall in 2023.
22         Q.     What's your personal relationship with
23  Garey Rittenhouse?
24         A.     We're friends.  We're business associates.
25         Q.     How long have you known him?

Faith Aluminum Company v.          FINAL                    April 28, 2025
Constellium Rolled Products                          Steve Stewart, Vol. 1

                                                              Page 48
 1          A.     I would say 2010, '11.
 2          Q.     15 years?
 3          A.     Yep.
 4          Q.     He didn't have the authority to bind Faith
 5     to a contract, did he?
 6                 MR. WITHERS:   Object to form.
 7                 THE WITNESS:   With my approval he
 8          did.
 9          Q.     (By Mr. Meadows) He couldn't sign a
10     written contract, could he?
11          A.     No, he couldn't.  He could negotiate the
12     contract.
13          Q.     So the corporation didn't give him the
14     authority to bind it in a contract, did it?
15                 MR. WITHERS:   Object to form.
16                 THE WITNESS:   Not that I know of,
17          no.
18          Q.     (By Mr. Meadows) You're only
19     communications with Garey have been oral; is that
20     right?
21          A.     Some -- very little e-mail and maybe some
22     text.  I looked back through them, but most of it's
23     personal stuff, stock stuff, investing things.
24          Q.     I'm asking because I didn't see a lot of
25     back and forth there?

```
                                              Page 49
 1         A.     I don't e-mail.  I don't e-mail.
 2         Q.     Tell me about that.  Do you communicate
 3    more by phone or...
 4         A.     Phone, yeah.
 5         Q.     In person?
 6         A.     And -- yeah, phone and in person, yeah.
 7         Q.     You described it as old school earlier.
 8         A.     Yeah, that's what I am.
 9         Q.     Confirm some of these things -- I know I
10    asked your wife about it, so don't be offended that
11    I'm asking you again.  But Garey Rittenhouse is not a
12    Faith director or officer, correct?
13         A.     Correct.
14         Q.     And he was not a Faith W-2 employee?
15         A.     Correct.
16         Q.     Does that -- if he's getting a commission
17    from you, is he still an employee or is he a
18    contractor?
19              MR. WITHERS:  Object to form.
20              THE WITNESS:  He -- he was working
21              in behalf of Faith on my -- on my behalf.
22         Q.     (By Mr. Meadows) I mean earlier when we
23    were talking, I asked if he was an employee and you
24    said, yes, but he wasn't a W-2 employee.  So I'm
25    trying to --
```

```
                                                      Page 50
 1          A.    He's working on my behalf and the
 2   company's behalf.
 3          Q.    Did you ever give him power of attorney?
 4          A.    No.
 5          Q.    Did you have a written contract of any
 6   kind with Garey Rittenhouse?
 7          A.    Shook his hand.
 8          Q.    Do you know that he owns a separate
 9   business called Regional Medical [sic]--
10          A.    Yes, I do.
11          Q.    -- Services?
12                Did Faith ever have any type of written
13   contract with RMC, Regional Metal Services?
14          A.    No.
15          Q.    Did you tell Sean George that
16   Garey Rittenhouse was your agent?
17          A.    I never talked to Sean George.  He never
18   picked up the phone and called me.
19          Q.    Would you know that anyone at Faith would
20   have told Sean that Garey was your -- was Faith's
21   agent?
22          A.    I don't know if Kim did or not.  That
23   would have been a question to ask her.  That would
24   have been the only one.
25          Q.    Have you read any of the communications
```

Faith Aluminum Company v.        **FINAL**                April 28, 2025
Constellium Rolled Products                      Steve Stewart, Vol. 1

```
                                                        Page 51
 1      between Mr. Rittenhouse and the folks that he was
 2      reaching out to on your behalf as part of this
 3      lawsuit?  Have you read those communications?
 4           A.    On which --
 5                 MR. WITHERS:  Object to form.
 6                 THE WITNESS:  -- ones now?
 7           Q.    (By Mr. Meadows) We have some
 8      communications, written between Garey Rittenhouse and
 9      other folks on behalf of you.  Have you reviewed
10      those kinds of documents in preparation?
11           A.    I have not reviewed them in preparation,
12      but I've seen them before in -- in recent
13      preparation.
14           Q.    Do your lawyers represent Garey
15      Rittenhouse?
16           A.    No.
17           Q.    Are you paying for separate legal counsel
18      for Garey Rittenhouse?
19           A.    No.
20           Q.    Do you know if Sean George had the about
21      to enter a contract for Constellium?
22           A.    I have no idea what Sean George's title
23      was with Constellium.
24           Q.    Did anyone from Constellium ever tell you
25      that Shawn George had the ability to enter a contract
```

Page 52

 1    with you?

 2         A.    They did not tell me he did or he didn't.

 3         Q.    Do you have any purchase orders that were

 4    personally issued by Sean George from Constellium?

 5         A.    We've got e-mails and -- where we tried to

 6    get the purchase order that they were -- promised

 7    they were going to send and they said, Hey, just use

 8    this number.

 9         Q.    If you don't know that Sean George could

10    contract for Constellium, then why are you contending

11    it in your lawsuit?

12              MR. WITHERS:  Object to form.

13              THE WITNESS:  That's what my

14         attorneys did.

15         Q.    (By Mr. Meadows) Did you pay

16    Mr. Rittenhouse for all the commissions that he

17    billed you for?

18         A.    Yes, I did.

19         Q.    And those invoices he submitted, were they

20    through Regional Metal Services?

21         A.    Yes, they were.  I believe they were.

22         Q.    Did you ever pay Mr. Rittenhouse in any

23    way other than those invoices?

24         A.    No.  Not that I know of, no.

25         Q.    For the work that Faith did for

```
                                              Page 53
 1     Constellium, do you know whether Mr. Rittenhouse
 2     invoiced you for commissions based only on pounds
 3     actually toiled?
 4          A.    He billed us -- we -- he invoiced us on
 5     what we had processed to that date.
 6          Q.    Did he submit invoices to you for
 7     commissions for the shortfall?
 8          A.    He would not have submitted an invoice
 9     until we got paid for it.
10          Q.    Do you intend to pay him for his
11     commissions for the shortfall if you get paid for it?
12          A.    Yes, I will.  I honor my agreements.
13          Q.    You're not aware that he ever -- if I
14     asked this before, forgive me.  Okay.  It's my grace,
15     I need in advance.  But you never saw any invoices
16     from Mr. Rittenhouse for those shortfall amounts,
17     correct?
18          A.    Correct.
19          Q.    That includes from the 1.3 period or the
20     1 million period as we talked about earlier?
21          A.    Right.
22          Q.    Has Mr. Rittenhouse done any work for you
23     since January of '24?
24          A.    He helped me facilitate selling the
25     equipment.
```

Faith Aluminum Company v.    FINAL                    April 28, 2025
Constellium Rolled Products                    Steve Stewart, Vol. 1

```
                                                  Page 54
  1          Q.    You talked earlier about having trouble
  2    getting a PO or a contract.  You'd mentioned that.
  3    You said you hadn't gotten a contract.  Let me walk
  4    that back.  I'm sorry.  I apologize.
  5                After that time period when
  6    Mr. Rittenhouse was working with you to try to help
  7    sell the business, did he earn commissions of any
  8    kind for you?
  9          A.    When he -- the business -- the equipment
 10    sold, yes, he did.
 11          Q.    Did you have a contract with
 12    Mr. Rittenhouse for that?
 13          A.    No, I shook his hand.
 14          Q.    Did Mr. Rittenhouse work with you on
 15    sourcing the shredder that you bought for processing
 16    3X?
 17          A.    No, I do all operations.
 18          Q.    So he didn't earn a commission on the
 19    purchase of it --
 20          A.    Right.
 21          Q.    -- the first time?
 22          A.    Right.
 23          Q.    He did earn a commission when you sold it?
 24          A.    He helped me facilitate selling all of the
 25    equipment, and he got a commission on it.
```

.

Page 62

1   could do.  This is still in May.  This was the month

2   of transition.  You know, do I think it happened on

3   May 9th when I decided I didn't buy any of these 3X

4   or was it the 19th, I don't know.  It was in May and

5   this was when all the negotiation was taken forth,

6   and we were seeing what we could do and what we

7   couldn't do and, you know.

8        Q.    What's the minimum mean, minimum monthly

9   toil volume or you don't do the deal, minimum -- or

10   there's a different -- what -- what does -- it says

11   minimum.  What's that mean for -- to you?

12        A.    It means they're going to ship that month.

13        Q.    So this is a put or pay?  This is a --

14   they have to -- they have to send you a 700,000?

15               MR. WITHERS:  Object to form.

16               THE WITNESS:  Again, this was early

17          in the discussions.  This was not what was

18          fin- -- finally agreed upon.  The

19          percentage, I think, even the prices

20          changed.  They argued it down to $0.18 and

21          $0.15 and this is early in the

22          negotiations.

23        Q.    (By Mr. Meadows) And -- and to be fair,

24   this e-mail, this one, which is 7, this doesn't

25   explain all that, right, this single page?

Page 63

```
 1        A.     There was more discussions afterwards.
 2        Q.     And do you know why you included a minimum
 3   month -- or why Garey included a minimum monthly on
 4   this page?
 5        A.     Because we needed a minimum monthly
 6   volume.  We had been discussing that from the
 7   beginning.  It was going to be that you ship this
 8   amount.
 9        Q.     When did the 700,000 become 1.3 million?
10        A.     In June when they figured out they bought
11   1.6 million pounds -- or in late May.  I don't know
12   the exact dates, but when the conversation with Sean
13   George and Garey happened, he was like, you know, I
14   got a bunch or whatever.  I don't know what exactly
15   happened, but they shipped a million-six or a
16   million-seven that first month.  And he said, Oh,
17   yeah, we -- we can do 1.3.
18        Q.     That's what you say Sean said to Garey?
19   In here -- in the --
20        A.     That's what they agreed upon.
21        Q.     In Exhibit 7, he talks about a ten-month
22   toiling contract.  What -- what's a ten-month?
23   Why -- why were we -- why ten months if you're trying
24   to sell out in 2023?
25        A.     We were not going to sell if we had enough
```

.

Faith Aluminum Company v.        FINAL                    April 28, 2025
Constellium Rolled Products                      Steve Stewart, Vol. 1

```
                                                      Page 66
    1         A.    You'd have to show me the -- show me that,
    2    because I don't remember that.
    3         Q.    Do you know when you started using that
    4    Wolf Shredder and the bisque tech screen to start
    5    doing the 5052?
    6         A.    It was delayed in delivery, and we did not
    7    get it till January 1st.
    8         Q.    Of '24?
    9         A.    January 2nd, yep.
   10         Q.    Well, you couldn't have used it in
   11    June '23 anyway?
   12         A.    No.  But we realized that we needed it to
   13    make a better product, and that's why we bought it,
   14    because we were trying to make a good product and
   15    honor our agreement.
   16         Q.    Bear with me for just a minute.
   17              MR. WITHERS:  Take your time. ^ CK
   18         speaker
   19              MR. MEADOWS:  It's 3:00 o'clock and
   20         my mind's starting to jell.  We may have to
   21         come back in the morning, but let me --
   22              MR. WITHERS:  Take your time.
   23              MR. MEADOWS:  I appreciate it.
   24         I'm -- I don't -- I don't want to make
   25         things worse by going too long.
```