IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

**Faith Aluminum Company,**

Plaintiff,

vs.

**Constellium Rolled Products
Ravenswood, LLC,**

Defendant.

Case No.: 4:24-cv-00151-WMR

### Plaintiff's Brief in Opposition to
### Defendant's Motion for Summary Judgment

Plaintiff Faith Aluminum Company ("Faith") respectfully requests that the Court deny Defendant Constellium Rolled Products Ravenswood, LLC's ("Constellium") *Motion for Summary Judgment.* At the very least, the evidence demonstrates that there are questions of fact regarding the terms of the contracts the parties entered in 2023 and 2024. Alternatively, even if the Court finds that no enforceable contracts existed—despite ample evidence to the contrary—Faith's alternative promissory estoppel claim remains viable.

## I.      Introduction

Faith "tolled" (*i.e.,* "processed") scrap aluminum alloy into a recyclable product for the aluminum flat rolled industry. Constellium manufactures rolled aluminum products. In 2023, Faith's outside sales representative, Garey

Rittenhouse, and Constellium's "metal champion," Shawn George, agreed that Constellium would ship Faith 9,100,000 pounds of scrap alloy over the remainder of 2023, and Faith would process that material at a rate of $0.18 per pound. Although their oral agreement was memorialized in several written documents, Constellium never delivered the all-encompassing contract it promised.

Constellium also failed to deliver the minimum quantities of scrap alloy it promised, resulting in a significant monetary shortfall in 2023. To address this shortfall, the parties agreed that, during the first four months of 2024, in addition to a base tolling rate, Constellium would pay an additional $0.0931 per-pound charge for the minimum 1 million pounds per month it promised to deliver. Once again, Constellium defaulted on its contractual obligations.

Now, Constellium argues that the parties never reached any enforceable agreement. The evidence says otherwise. The undisputed facts conclusively demonstrate that the parties reached enforceable agreements in both 2023 and 2024. Nevertheless, even under Constellium's theory, genuine issues of fact remain. Thus, summary judgment is inappropriate and unwarranted.

## II.    Material Facts

Pursuant to LR 56.1(B)(2)(a), Faith responds to Constellium's *Statement of Undisputed Material Facts* in Faith's contemporaneously filed *Response to Defendant's Statement of Undisputed Material Facts*. Further, pursuant to LR

56.1(B)(2)(b), Faith sets forth additional facts that are material and present genuine issues for trial in its accompanying *Statement of Additional Material Facts*.

## III.    Argument & Citation to Authorities

### A.    Standard of Review

Summary judgment is appropriate only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.56(c). The movant has the burden of showing the absence of a genuine issue of material fact. *Tate v. Spirit Airlines, Inc.,* 957 F. Supp. 2d 1359, 1371 (S.D. Fla. 2013). Material facts are those over which disputes "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Disputed, material facts are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, "the courts should view the evidence and all factual inferences therein in the light most favorable to the [non-moving] party" and resolve "all reasonable doubts about the facts…in favor of the non-movant." *Reynolds v. Bridgestone/Firestone, Inc.,* 989 F.2d 465, 469 (11th Cir. 1993). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1297 (11th Cir. 1983).

3

Moreover, under Georgia law, "[a]s a general rule, parol evidence is inadmissible to add to, take from, vary or contradict the terms of a written instrument. However, if there is an ambiguity, latent or patent, it may be explained; so if a part of a contract only is reduced to writing…, and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible. If the writing appears on its face to be an incomplete contract and if the parol evidence offered is consistent with and not contradictory of the terms of the written instrument, then the parol evidence is admissible to complete the agreement between the parties." *Jordan v. Tri Cty. Ag*, 248 Ga. App. 661, 663 (2001); *see also Ironshore Specialty Ins. Co. v. RPG Hosp., LLC*, 368 Ga. App. 199, 204 (2023).

**B.    Faith and Constellium Entered Enforceable Contracts.**

Constellium argues that "Faith has no evidence that Constellium contractually agreed to pay Faith for monthly minimums of tolling regardless of whether the tolling occurred." (Doc. 30-1 at 13.) Constellium is incorrect.

Under Georgia law, "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. "If the writing appears on its face to be an incomplete contract and if the parol evidence offered is consistent with and not

4

contradictory of the terms of the written instrument, then the parol evidence is admissible to complete the agreement between the parties." *Jordan*, 248 Ga. App. 661, 663 (2001).

Here, there is no genuine dispute as to these elements. Faith and Constellium were the parties to the contracts, the subject matter of which was Faith's agreement to toll minimum volumes of scrap alloy at a set price per pound. Thus, the consideration was Faith's agreement to process scrap alloy in exchange for Constellium's payment for Faith's services. Further, the evidence shows that the parties assented to those terms.

The only issue that Constellium disputes is whether it had an obligation to pay Faith for the volume of scrap it requested Faith to toll, even if Constellium failed to deliver that volume to Faith. (Doc. 30-1 at 13.) Constellium now asserts that it never agreed to deliver and pay for such minimum volumes, but the evidence tells a different story.

Garey Rittenhouse—Faith's outside sales representative whom Steve Stewart testified had the authority to "negotiate the contract" and to bind Faith to a contract with his approval (**Exhibit A,** Deposition of Steve Stewart ("S. Stewart Dep.") at 48:4-8)[1]—testified that, in June 2023, he ultimately agreed with

---

[1]     **Bolded references to "Exhibits"** correspond to the Exhibits filed contemporaneously herewith, pursuant to LR 56.1(C).

Shawn George that Constellium would deliver 1.3 million pounds of scrap each month from June through December 2023. (**Exhibit B,** Declaration of Garey Rittenhouse ("Rittenhouse Decl.") ¶ 10.) Steve Stewart was unequivocal on this point, as well, explaining that "we needed a minimum monthly volume. We had been discussing that from the beginning. It was going to be that you ship this amount.") (**Exhibit A,** S. Stewart Dep. at 63:2-8; **Exhibit B,** Rittenhouse Decl. ¶¶ 16-17 (describing Mr. Rittenhouse's numerous conversations with S. George to discuss the 2023 shortfall).) Thus, Constellium's contention that "Faith has no evidence that the amount of 1.3 million pounds per month ever came up in communications with Constellium before it mentioned the figure on December 12 [2023]"[2] (Doc. 30-1 at 14) is patently false.[3]

Moreover, in his December 13, 2023 e-mail, Mr. Rittenhouse detailed how Faith calculated the amount due for the 2,956,403-pound shortfall in 2023, which equaled the 9.1 million pounds of scrap Constellium had promised to deliver,

---

[2] Due to time zone differences, Mr. Rittenhouse's December 12 and 13, 2023 e-mails appear on some versions as December 13 and 14, depending on the party that produced the document. For the sake of consistency, Faith will match Constellium's format (*i.e.,* December 12 and 13.) Note that deposition transcripts and exhibits may refer to those e-mails as having been sent on December 13 and 14.

[3] Notably, although Constellium initially sought to depose Mr. Rittenhouse, interviewed him at least twice, and discussed preparing a declaration for his signature, it ultimately elected not to depose him or otherwise secure his testimony in a declaration. (**Exhibit B,** Rittenhouse Decl. ¶ 31.) Presumably, Constellium realized his testimony would not be favorable.

4931-2204-2702.v3

less the 6,143,597 pounds that it actually provided. (**Exhibit B,** Rittenhouse Decl. ¶¶ 22-23 and Ex. 2 thereto; **Exhibit C,** Deposition of Shawn George ("S. George Dep.") at 147:8-155:11 and Ex. 17 thereto **(Exhibit D)**.) Significantly, though Mr. George now claims that he verbally disputed Mr. Rittenhouse's calculations, he *never* did so. (**Exhibit B,** Rittenhouse Decl. ¶ 24 ("Shawn George Never communicated to me, either in writing or over the telephone, that he disagreed with the calculations or analysis set forth in my December 13, 2023 e-mail."); *see also* **Exhibit C,** George Dep. at 155:12-156:25 ("[W]hen I did respond to him in e-mail, I didn't address that conversation."); *id.* at 242:3-243:12 (confirming he never disputed the December 13, 2023 e-mail in writing).)

Mr. George's failure to dispute Mr. Rittenhouse's December 13, 2023 e-mail, including the calculations contained therein, is significant. In Georgia, "[i]n the ordinary course of business, when good faith requires an answer, it is the duty of the party receiving a letter from another to answer within a reasonable time. Otherwise, the party shall be presumed to admit the propriety of the actions mentioned in the letter of the party's correspondent and to adopt them." O.C.G.A. § 24-14-23; *see also* Fed R. Evid. 302 ("In a civil case, state law governs the effect of a presumption regarding a claim or defense for which state law supplies the rule of decision."). If Mr. George disagreed with Mr. Rittenhouse's e-mail, as a matter of Georgia law, he should have said as much *then*—not a year-

7

and-a-half and one lawsuit later, when sitting for deposition. Tellingly, however, Mr. George did *not* dispute Faith's calculations at the time. (**Exhibit B,** Rittenhouse Decl. ¶ 24; **Exhibit C,** George Dep. at 155:12-156:25; *id.* at 242:3-243:12.)

Moreover, on January 9, 2024, Constellium issued a "CONTRACT/ PURCHASE ORDER" for 1 million pounds of scrap per month for January through April 2024 ("2024 Purchase Order"). (**Exhibit B,** Rittenhouse Decl. ¶¶ 25-26 and Ex. 3 thereto; **Exhibit C,** George Dep. at 157:25-164:12: and Exs. 18 and 19 thereto **(Exhibits E and F, respectively**.) The 2024 Purchase Order refers not to the "capacity" that Faith had agreed to "make available"—as Constellium now contends—but rather to a specific "Qty Ordered." (*Id.*)

Further, in his January 9, 2024 cover e-mail attaching the 2024 Purchase Order, Mr. George wrote that he had "written this PO to encompass January through April at the $.2931/lb. rate we previously discussed." (*Id.*) The *only* credible reason Constellium agreed to pay Faith $0.2931 per pound, including a $0.0931-per pound additional charge—an increase of *62%* over the prior year—is because it acknowledged that it was paying for the 2023 shortfall, as set forth in Mr. Rittenhouse's December 13, 2023 e-mail. There is no other reasonable explanation, and the additional $0.0931-per pound charge is directly tied to the 2023 shortfall. (**Exhibit B,** Rittenhouse Decl. ¶¶ 22-24 and Ex. 2 thereto.)

4931-2204-2702.v3

Thus, contrary to Constellium's contention, the parties *did* have enforceable contracts in 2023 and 2024. The very *title* of the 2024 Purchase Order Constellium created reads "CONTRACT/PURCHASE ORDER." The parties agreed on all material terms: the minimum volume of scrap Constellium promised to deliver and the price it would pay Faith to process that scrap. These terms are not incomplete, incomprehensible, vague, indefinite, or uncertain.[4]

Additionally, the fact that Constellium never *signed* an all-inclusive written contract memorializing the parties' agreement does not negate the *existence* of the contract. "Assent to the terms of a contract may be given other than by signatures…. If one of the parties has not signed, his acceptance is inferred from a performance under the contract, in part or in full, and he becomes bound." *Del Lago Ventures v. QuikTrip Corp.*, 330 Ga. App. 138, 144 (2014); see also *Comvest, LLC v. Corp. Security Group*, 234 Ga. App. 277, 280-281 (1998) ("Parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under

---

[4]    Constellium suggests that, because it "did not provide Faith with a copy of a purchase order in 2023," no 2023 contract existed. (*See* Doc. 30-1 at 6.) But Constellium *did* "provide[] Faith with…the sequential *purchase order number*…that Faith was to use on its invoices." (*Id.*) Constellium cannot negate the validity of the 2023 contract merely because it failed to deliver a purchase order or contract to Faith. Indeed, Faith's employee, Kim Watson, testified that Constellium "gave me a PO number. They would not give me an actual purchase order. I never received one until January of 2024." (**Exhibit G,** Deposition of Kim Watson at 49:21-24.)

9

the contract, or the acceptance by one of the performance by the other"). Through performance consistent with the terms of the agreement—and by accepting Faith's performance—Constellium demonstrated assent to those terms, thereby ratifying and confirming the contract's existence and enforceability.

The record is replete with evidence that, although Faith *repeatedly* requested that Constellium deliver a formal contract and that Constellium promised to do so, Constellium never delivered on that promise, either. (**Exhibit B,** Rittenhouse Decl. ¶¶ 13-15, 20; **Exhibit A,** S. Stewart Dep. at 101:14-21, 102:7-18.) Mr. George explained that "[g]etting a written contract at Constellium is a (sic) extensive process…It can sometimes take months and months." (**Exhibit C,** George Dep. at 71:3-17.) Constellium's personnel also understood a formal contract was imminent. (*Id.* at 80:18-24 "[W]e were talking about Faith Aluminum and their contract as a whole all the time."); *id.* and Ex. 9 thereto **(Exhibit H)** ("[H]ave you moved further along w/ the other contract you spoke to me about w/ Faith Aluminum[?]); **Exhibit I,** Deposition of Jennifer Fife ("Fife Dep.") at 37:7-15 and Ex. 10 thereto **(Exhibit J)** ("Will have another contract coming through on the scrap side. Working a deal w/ Faith Aluminum.").)

Constellium *never* indicated that it did not intend to prepare a formal contract. (**Exhibit B,** Rittenhouse Decl. ¶ 14.) Indeed, as late as January 9, 2024, Mr. George *continued* to assure Faith that the formal contract was forthcoming.

10

(*Id.* ¶ 25 and Ex. 3 thereto; **Exhibit C,** George Dep. at 158:18-159:1 and Ex. 18 thereto **(Exhibit E)** ("I am still working on the formal contract for 2024.").)

Now, of course, it appears that the reason Constellium never delivered the promised documentation was that Mr. George had made a promise to Faith that he could not keep. Because the creation of a formal contract was a lengthy process, Mr. George explained that, in the interim, Constellium relied on purchase orders. (**Exhibit C,** George Dep. at 71:18-72:17.) However, Jennifer Fife, Constellium's then-Director of Procurement, testified that it was "not normal" for Constellium to engage a vendor to perform tolling services without a formal written contract. (**Exhibit I,** Fife Dep. at 25:15-19.) Rather, if Constellium needed a vendor to begin work immediately, the preferred approach was "to fast track the contract, putting resources to it, making it a priority." (*Id.* at 26:14-17.) Contrary to Mr. George's testimony, she confirmed that it was "not standard operating procedure to rely on purchase orders only." (*Id.*) And she would have expected Mr. George to be aware that Constellium preferred to have a written contract in place before a vendor processed scrap. (*Id.* at 73:20-74:4.) When asked why Constellium never provided a formal written contract in 2023, Mr. George explained that, "before that could be done, we began to have issues with Faith about volumes and things of that nature." (**Exhibit C,** George Dep. at 73:8-15.) In

11

short, the reason Faith never signed a formal written contract is that Constellium *simply refused to provide one after it breached the parties' agreement.*

### C. Constellium's Argument Regarding an "Oral Contract" Fails.

In referring to an "oral contract" that "arose from oral communications between Garey Rittenhouse and Shawn George" (Doc. 30-1 at 18), Constellium misstates Faith's position. To be clear, Faith contends that those oral conversations resulted in enforceable contracts memorialized in multiple *written* documents. For example, Mr. Rittenhouse's December 13, 2023 e-mail to Mr. George is a *written document* setting forth the terms they discussed in their earlier phone call—a writing to which Constellium never objected. (**Exhibit C,** George Dep. at 156:22-25.) And the 2024 Purchase Order is a *written document* that, at least for the months of January through April 2024, required Constellium to deliver 1 million pounds of scrap per month and pay Faith $0.2931 per pound to process it. Thus, the parties' 2023 and 2024 contracts were at least partially *written* agreements, not solely oral agreements.

Constellium argues first that "Mr. Rittenhouse had no ability to directly enter into a contract for Faith." (Doc. 30-1 at 18 (arguing that "Faith did not give Mr. Rittenhouse the authority to bind the corporation to a contract").) That assertion is demonstrably false. Mr. Rittenhouse served as Faith's outside sales representative for *years*—including vis-à-vis Constellium's Muscle Shoals plant.

12

(**Exhibit B,** Rittenhouse Decl. ¶¶ 4, 8.) At all times during Mr. Rittenhouse's representation of Faith, Mr. Stewart authorized him to negotiate contracts on Faith's behalf. (*Id.* ¶ 6.) Notably, before this lawsuit, Constellium never questioned or disputed whether Mr. Rittenhouse was authorized to speak or negotiate on behalf of Faith. (*Id.* ¶¶ 8-9.)

This is consistent with Mr. Stewart's testimony, who testified as follows:

Q:     He didn't have the authority to bind Faith to a contract, did he?

MR. WITHERS: object to form.

THE WITNESS: *With my approval he did.*

Q:     (By Mr. Meadows) He couldn't sign a written contract, could he?

A:     No, he couldn't. *He could negotiate the contract.*

Q:     So the corporation didn't give him the authority to bind it in a contract, did it?

MR. WITHERS: Object to form.

THE WITNESS: Not that I know of, no.

(**Exhibit A,** S. Stewart Dep. at 48:4-17, emphasis supplied.) Thus, Garey Rittenhouse *did* have the authority to bind Faith to a contract with Mr. Stewart's approval, which approval he granted. (*See id.* at 21:8-22 (explaining that Mr. Rittenhouse "handled all the contract stuff with just about anybody we dealt

4931-2204-2702.v3

with"); *id.* at 91:9-20 (explaining that Mr. Rittenhouse "was handling communications with Constellium").)[5]

There is no credible dispute that Mr. Rittenhouse had actual authority to negotiate with Mr. George on Faith's behalf. More importantly, however, there is no credible dispute that he had *apparent* authority to do so, either. "The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." O.C.G.A. § 10-6-1. Thus, not only did Mr. Stewart expressly authorize Mr. Rittenhouse to act on Faith's behalf, but Faith ratified those acts by performing tolling services for Constellium. Further, Mr. George's own communications demonstrate that *he* believed Mr. Rittenhouse had the authority to act on Faith's behalf. (**Exhibit C,** George Dep. at 66:8-17 and Ex. 6 thereto **(Exhibit K)**. ("Garey is with Faith Aluminum and we work as a team on this project."); *id.* at Ex. 4 thereto **(Exhibit L)** ("I have gone back to Garey at Faith one

---

[5]     Constellium also argues that there is "no evidence that Constellium, as a limited liability company, agreed to any contract terms." (Doc. 30-1 at 18, n.11.) The Court should reject that argument on its face, as reflected in its written communications with Faith. Further, Constellium's insinuation that Mr. George had no authority to enter a contract on behalf of the company is belied by the facts that (1) Constellium sent scrap alloy and tendered payment to Faith at his direction, and (2) he personally sent the 2024 Purchase Order to Mr. Rittenhouse. At a minimum, Mr. George had apparent authority to act on Constellium's behalf.

4931-2204-2702.v3

more time to get a better fee."); *id.* at Ex. 7 thereto **(Exhibit N)**. ("I have spoken to Garey at Faith Aluminum regarding our upcoming physical inventory.").)

Constellium also argues that there is no evidence that Faith "entered an oral contract with Mr. Rittenhouse as a conduit" because "[n]o one who could enter a contract for Faith knows what Mr. Rittenhouse and Mr. George discussed." (Doc. 30-1 at 18-19.) Again, this assertion is inaccurate. With Mr. Stewart's approval, Mr. Rittenhouse had the authority to bind Faith (**Exhibit A,** S. Stewart Dep. at 48:4-8),[6] and Mr. Rittenhouse explained the terms he negotiated with Mr. George. (**Exhibit B,** Rittenhouse Decl. ¶ 10.) Thus, assuming Faith's contract with Constellium was purely oral in nature—which Faith disputes—Mr. Rittenhouse, as Faith's agent, was aware of the terms to which the parties agreed.

### D.   Constellium Entered Into a Take-Or-Pay Contract With Faith.

Constellium contends its contract with Faith was not an enforceable "take-or-pay" contract for eleven (11) reasons. None has any merit.

**First,** Constellium argues that "Faith never said it wanted a contract for 1.3 million pounds minimum per month." (Doc. 30-1 at 20.) The May 9 and 19, 2023

---

[6] Whether Mr. Rittenhouse had the authority to *execute* written contracts on behalf of Faith versus whether he had the authority to *negotiate and bind* Faith to the parties' agreement are two separate questions. Constellium's attempt to conflate them falls flat.

e-mails upon which Constellium relies reflect early discussions before the parties reached their 2023 agreement for volumes and rates. (*See* **Exhibit B,** Rittenhouse Decl. ¶ 10 (testifying that the parties reached an agreement in June 2023).) Thus, Constellium's reliance upon these e-mails is misguided.

**Second,** Constellium relies upon a June 14, 2023 e-mail in which Mr. Rittenhouse shared Faith's banking information "so Constellium may remit payment for ***tolling services rendered***." (Doc. 30-1 at 20 (emphasis in original) and Ex. 16 thereto.) Mr. Rittenhouse sent this e-mail before the parties reached their agreement, and it was ministerial in nature (*i.e.,* providing banking information). In seizing upon this language, Constellium takes the excerpt out of context, as nothing Mr. Rittenhouse wrote has any relation to the agreement they reached. (And, of course, at that time, Mr. Rittenhouse did not know that Constellium would ultimately breach its contract.) This is a silly argument.

**Third,** Constellium alleges that "Faith sought payment only for the work it performed" and "invoiced Constellium in 2023 for the amounts of poly 50502 scrap that Faith processed and not for 1.3 million pounds per month." (Doc. 30-1 at 21.) Significantly, Constellium ignores the fact that, in December 2023, Mr. Rittenhouse sent multiple e-mails to Mr. George discussing the 2023 shortfall. (**Exhibit B,** Rittenhouse Decl. ¶¶ 21-24 and Exs. 2 and 3 thereto.) Constellium also ignores Mr. Stewart's testimony that "we would settle it up at 90 days…[t]o

make up for the shortfall of the three-month period." (**Exhibit A,** S. Stewart Dep. at 82:7—83:1; Rittenhouse Decl. ¶ 17 (discussing the planned reconciliation process).) Thus, the fact that Faith *initially* invoiced Constellium only for the scrap that Constellium delivered does not absolve Constellium of its contractual obligations, especially given Faith's later efforts to collect the full amount due.

**Fourth,** Constellium highlights that "Mr. Rittenhouse likewise invoiced Faith for his Constellium commissions based on the pounds of poly 5052 scrap delivered to Faith for processing, not on any minimum amounts that Mr. Rittenhouse supposedly negotiated." (Doc. 30-1 at 21.) Yet again, Constellium omits critical testimony. Mr. Stewart testified that Mr. Rittenhouse "would not have submitted an invoice [for his commissions] until we got paid for it." (**Exhibit A,** S. Stewart Dep. at 53:6-12.) Critically, when asked if he would pay Mr. Rittenhouse "for his commissions for the shortfall if you get paid for it," Mr. Stewart left no doubt: "Yes, I will. *I honor my agreements.*" (*Id.*, emphasis supplied.)

**Fifth,** Constellium contends that "Faith actively marketed its plant for sale *in 2023*…and would not have been able to fulfill its alleged contractual obligations to Constellium had it sold its plant." (Doc. 30-1 at 21, emphasis supplied.) Of course, such a conclusion is rank speculation; had Mr. Stewart sold his business in 2023, a buyer would have presumably assumed any existing

contracts. But, more importantly, Mr. Stewart did *not* sell his business in 2023, and, further, as to the eventual sale in 2024, he testified that "[i]f [Constellium] had honored their end of the contract that we were in, *I never would have attempted to sell it.*" (**Exhibit A,** S. Stewart Dep. at 155:2-4, emphasis supplied.)

**Sixth,** Constellium incredulously insists that Faith's proposal that Constellium pause deliveries in December 2023 is proof of the absence of an enforceable contract. (Doc. 30-1 at 21.) How Faith's plan to "give[e] our employees two weeks off for Christmas" (*id*.) relates to the enforceability of the parties' contract is a mystery. But, to clarify, Mr. Stewart explained that Constellium "had not shipped what they said they were going to ship prior to that date, and I didn't want it coming in all right before Christmas before we were going to be out of the plant for two weeks." (**Exhibit A,** S. Stewart Dep. at 98:9-13.) This is a further example of Constellium twisting testimony to argue a point that is simply not supported by the complete factual record.

**Seventh,** Constellium suggests that "the parties were still negotiating in late December 2023 and ended the year without a contract." (Doc. 30-1 at 22.) Constellium mischaracterizes the deposition testimony. Mr. Stewart explained that, in late December 2023, "[t]hat was an ongoing negotiation *supposed to pay, not paying, what are you going to do, you know, you need to pay us.* (**Exhibit A,** S. Stewart Dep. at 85:21-86:5, emphasis supplied.) Further, as to Constellium's

18

failure to provide the formal written contract for 2023, Mr. Stewart testified that, "It's typical what they always did. They never sent a contract." (*Id.* at 102:7-18; *see also id.* at 104:1-107:13 (explaining that, even in late 2023, Faith was still awaiting a formal document memorializing the terms to which they had agreed in June 2023.) Thus, there was never any doubt that the parties had agreed on the material terms of their contract in June 2023; Faith was simply awaiting a formal written document *memorializing* those terms. If there were any "ongoing negotiations" in December 2023, they concerned *when Constellium would pay what it owed*, not whether the parties had an enforceable contract.

**Eighth,** Constellium urges the Court that "the parties were still negotiating in late January 2024 and never agreed on a contract for 2024." (Doc. 30-1 at 22 and Ex. 21 thereto.) But Constellium ignores the fact that, by that point, Constellium had *already defaulted under the terms of the 2024 Purchase Order*. (**Exhibit A,** S. Stewart Dep. at 117:19-21 ("We sent an invoice to see if they were going to pay it, and they would not agree to pay it based on the January PO."); **Exhibit B,** Rittenhouse Decl. ¶ 29 and Ex. 4 thereto (explaining that his January 24, 2024 e-mail to S. Stewart contemplated a modification to the terms of the 2024 Purchase Order to which Constellium had *already* agreed and *already* violated).) Time and again, Constellium failed to honor its obligations, and time and again,

4931-2204-2702.v3

Faith attempted to make accommodations to allow Constellium a chance to make good on its promises. Regrettably, Constellium never did.

**Ninth,** Constellium notes that it "never signed a contract with Faith." (Doc. 30-1 at 22.) Although Mr. Stewart conceded this point, he clarified that "[t]hey just promised a contract." (**Exhibit A,** S. Stewart Dep. at 118:3-6.) There is no dispute that the parties never executed a singular document memorializing the terms to which they agreed first in June 2023 and again in January 2024. But Constellium's refusal to send that singular document it said it was "still working on" and just needed to get "all buttoned up" (**Exhibit C,** George Dep., Ex. 18 thereto) does not negate the fact that the parties had long ago agreed on the material terms to be contained in that final written memorialization.

**Tenth,** Constellium relies on Jennifer Fife's testimony that it "never entered take-or-pay contracts with tolling vendors." (Doc. 30-1 at 22.) Yet, Ms. Fife—who was *not* Constellium's Rule 30(b)(6) representative—also admitted that she never spoke with Garey Rittenhouse, Steve Stewart, or any other Faith employee. (**Exhibit I,** Fife Dep. at 22:18-24:2.) Moreover, she confirmed that the very practice in which Shawn George had engaged—hiring Faith to toll scrap without a formal written contract in place—was "not normal," "not standard operating procedure," and "not typical." (*Id.* at 25:15-19, 26:14-17, and 32:1-15.) She simply has no knowledge of the terms that Mr. George negotiated.

20

In any event, Constellium *has* entered into take-or-pay contracts with tolling vendors, including Faith and others. (**Exhibit B,** Rittenhouse Decl. ¶¶ 2 and 11 (stating that he is a 35-year veteran of the primary and secondary aluminum industry and that he "understand[s] that Constellium has entered into other minimum volume contracts, also known as 'take or pay' or 'put or pay' contracts, with tolling companies like Faith.")

**Eleventh,** Constellium argues that Faith could not have performed its contractual obligations after January 2024 because Faith ceased operations and sold its assets. (Doc. 30-1 at 22.) Again, Constellium ignores Mr. Stewart's testimony: "If [Constellium] had honored their end of the contract that we were in, *I never would have attempted to sell it.*" (**Exhibit A,** S. Stewart Dep. at 154:23-155:4, emphasis supplied.) Under Georgia law, "[w]here by breach of a contract a party is injured, he is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence." O.C.G.A. § 13-6-5. Following Constellium's numerous breaches, Faith "couldn't continue running the plant at a loss" (**Exhibit A,** S. Stewart Dep. at 120:10-20), so it sold its assets to mitigate its damages. Constellium is not entitled to summary judgment on Faith's claim for breach of contract simply because Faith sought to mitigate its damages.

4931-2204-2702.v3

### E.     Faith's Alternative Claim for Promissory Estoppel is Valid.

The elements of promissory estoppel are (1) the defendant made certain promises, (2) the defendant should have expected that plaintiff would rely on such promises, (3) the plaintiff did in fact rely on such promises to its detriment, and (4) injustice can be avoided only by enforcement of the promise." *Houston v. Houston*, 267 Ga. App. 450, 451 (2004). Faith has proven all these elements.

First, Garey Rittenhouse testified that he and Shawn George agreed that Constellium would deliver 1.3 million pounds of scrap each month from June through December 2023. (**Exhibit B,** Rittenhouse Decl. ¶ 10.) Second, in issuing the 2024 Purchase Order for 1 million pounds each for the months of January through April at a rate of $0.2931 per pound, Constellium acknowledged that, as set forth in the December 13, 2024 e-mail, it was paying for the 2023 shortfall, which was based on Constellium's June 2023 promise to deliver 9.1 million pounds of scrap over the remainder of that year. Finally, when asked whether Constellium expected Faith to "process between 700,000 and 1.5 million pounds for us ongoing," Mr. George replied, "I sure hope so, *We did a deal*." (**Exhibit C,** George Dep. at 238:10-17 (emphasis supplied).)

Third, Faith purchased equipment to process the Constellium's scrap based on its promises. (**Exhibit A,** S. Stewart Dep. at 156:9-158:23 (confirming that "Faith purchased approximately $1.1 million in necessary equipment and

22

made other investments to fulfill its contractual obligations to Constellium, including a Wolf shredder and a Bivitek screen," which enabled Faith to increase its production, lower its cost, and produce a fully clean product.).)

Fourth, injustice can only be avoided by the enforcement of Constellium's promise. Constellium promised to deliver certain minimum volumes of scrap to Faith for processing and to pay Faith for that work. Faith was ready, willing, and able to perform its end of the bargain, and justice requires that Constellium be made to uphold its end, as well.

Constellium's argument that Faith cannot prove any of these elements (Doc. 30-1 at 23-24) fails. First, as explained above, Constellium agreed to pay Faith $1,638,000 to toll 9.1 million pounds of scrap in 2023. (**Exhibit B,** Rittenhouse Decl. ¶ 10.) Second and third, Constellium argues that "Faith never told Constellium that it needed additional equipment" and that Faith did not "need the new equipment to toll for Constellium." (Doc. 30-1 at 23-24.) Both statements are inaccurate. (*See* **Exhibit C,** George Dep. at 191:14-19 and Ex. 20 thereto **(Exhibit N)** (advising Mr. George that "we will be installing some new equipment into the production line"); *id.* at 192:20-24 (acknowledging that tolling scrap was "somewhat of a self-destructive process, the equipment wears out."). Further, a promissory estoppel claim requires only that a plaintiff rely on the defendant's promise to its detriment; Faith is aware of no case law requiring that

4931-2204-2702.v3

a plaintiff "tell" the defendant that the plaintiff "needs" to rely on that promise. Rather, the promisor should only "*reasonably expect* to induce action or forbearance on the part of the promissee." O.C.G.A. § 13-3-44(a) (emphasis supplied).[7] Fourth, the fact that Faith sold the equipment it purchased (Doc. 30-1 at 24) is irrelevant because the value of that equipment is not an element of Faith's damages. Instead, Faith's purchase of equipment demonstrates its reasonable reliance on Constellium's promise, and injustice can only be avoided by the *enforcement of Constellium's promise*, not by recovering the value of Faith's investment.

## F. Faith Has a Viable Claim for Attorney's Fees.

Faith's claim for attorneys' fees under O.C.G.A. § 13-6-11 is derivative of its other claims. As shown above, Faith should prevail on its claims for breach of contract or, alternatively, promissory estoppel at trial; for now, though, questions of fact remain, which a jury must evaluate. Further, the jury could justifiably find that Constellium acted in bad faith by (1) promising to deliver a formal written contract to Faith with no legitimate intention of doing so, (2) reneging on its promise to deliver—or at least pay for—the full volume of scrap required under

---

[7]     Moreover, even under Constellium's inaccurate assertion that Faith only agreed to make certain minimum volume *available* to Constellium, that would necessarily mean that Faith would *forgo* that capacity to process scrap for other potential customers, which is another form of detrimental reliance.

the parties' contracts, and (3) taking the untenable position that it does not owe Faith for the 2023 shortfall given that it issued the 2024 Purchase Order to include an additional $0.0931-per pound fee for the express purpose of repaying that debt. Thus, because the Court should deny Constellium's motion for summary judgment Faith's substantive claims, so, too, it should deny Constellium's motion as to Faith's claim for attorney's fees.

## IV. Conclusion

There can be no doubt that Faith and Constellium entered binding, enforceable contracts for the processing of scrap aluminum in 2023 and 2024. *At most*, a dispute exists regarding whether Constellium was obligated to deliver minimum monthly quantities of scrap to Faith for processing, or, failing that, to pay Faith for the shortfall. Even under Constellium's theory of the case, a jury must resolve any such dispute. Moreover, even if the Court finds that no enforceable contracts existed, Faith has shown that it detrimentally relied on Constellium's promises such that it may still prevail under a theory of promissory estoppel.

For the foregoing reasons, Faith respectfully requests that the Court **deny** Constellium's *Motion for Summary Judgment.*

*[Signature appears on following page.]*

4931-2204-2702.v3

June 20, 20256/20/2025.[8]

ARNALL GOLDEN GREGORY LLP

*/s/ C. Knox Withers*

C. Knox Withers
Georgia Bar No. 142482
Morgan E. M. Harrison
Georgia Bar No. 470983
Avery E. Carter
Georgia Bar No. 443820

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
404-873-8129
knox.withers@agg.com
morgan.harrison@agg.com
avery.carter@agg.com

*Attorneys for Plaintiff Faith*
*Aluminum Company*

---

[8] The undersigned counsel certifies that this document has been prepared in Book Antiqua font (13 point).

4931-2204-2702.v3

## Certificate of Service

I certify that, on this date, I served Defendant with a copy of the foregoing **Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment** by electronic filing, which will cause a copy to be delivered to Defendant's attorney of record addressed to:

John J. Meadows
STEPTOE & JOHNSON PLLC
707 Virginia Street E.
Suite 1700
Charleston, West Virginia 25301

June 20, 20256/20/2025.

ARNALL GOLDEN GREGORY LLP

*/s/ C. Knox Withers*
C. Knox Withers
Georgia Bar No. 142482
Morgan E. M. Harrison
Georgia Bar No. 470983
Avery E. Carter
Georgia Bar No. 443820

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
404-873-8129
knox.withers@agg.com
morgan.harrison@agg.com
avery.carter@agg.com

*Attorneys for Plaintiff Faith
Aluminum Company*

27