IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

**Faith Aluminum Company,**

Plaintiff,

vs.

**Constellium Rolled Products
Ravenswood, LLC,**

Defendant.

Case No.: 4:24-cv-00151-WMR

**Plaintiff's Statement of Additional Material Facts**

Pursuant to LR 56.1(B)(2)(b), Plaintiff Faith Aluminum Company ("Faith") respectfully responds its *Statement of Additional Material Facts* in response to Defendant Constellium Rolled Products Ravenswood, LLC's ("Constellium") *Motion for Summary Judgment* as follows:

### A. Garey Rittenhouse's Role

1.    Garey Rittenhouse is the President of Regional Metal Services, Inc. (**Exhibit B,** Declaration of Garey Rittenhouse ("Rittenhouse Decl.") ¶ 2.)[1]

2.    Mr. Rittenhouse serves and has served as the outside sales representative of companies that "toll" (*i.e.*, process) scrap aluminum alloy,

---

[1]    **Bolded references to "Exhibits"** in Faith's responses correspond to the Exhibits attached to Faith's contemporaneously-filed *Brief in Opposition to Defendant's Motion for Summary Judgment*, pursuant to LR 56.1(C).

including, but not limited to, Faith Aluminum Company ("Faith"). (**Exhibit B,** Rittenhouse Decl. ¶ 2.)

3.      Mr. Rittenhouse has worked in the primary and secondary aluminum industry my entire career, beginning in 1990. (**Exhibit B,** Rittenhouse Decl. ¶ 2.)

4.      When Steve and Muriel Stewart established Faith, Mr. Rittenhouse began serving as an outside sales representative and consultant for Faith. (**Exhibit B,** Rittenhouse Decl. ¶ 4.)

5.      Among other activities, Mr. Rittenhouse actively marketed Faith's tolling capabilities, negotiated deals with suppliers and customers, and acted as a liaison between Faith and those suppliers and customers. (**Exhibit B,** Rittenhouse Decl. ¶ 4.)

6.      Mr. Rittenhouse had the authority to negotiate contracts on behalf of Faith and to bind Faith to contracts with the approval of Steve Stewart. At all times during my representation of Faith, Steve Stewart authorized me to negotiate contracts on Faith's behalf. (**Exhibit A,** Deposition of Steve Stewart ("S. Stewart Dep.") at 48:4-17; *id.* at 21:8-22 (explaining that Mr. Rittenhouse "handled all the contract stuff with just about anybody we dealt with"); *id.* at 91:9-20 (explaining that Mr. Rittenhouse "was handling communications with Constellium"); **Exhibit B,** Rittenhouse Decl. ¶ 6.)

**B.    Faith's Business Relationship with Constellium in 2023**

7.      In late April and/or early May 2023, on behalf of Faith, Mr. Rittenhouse initiated communications with Constellium through its representative, Shawn George, regarding Faith's tolling capabilities. (**Exhibit B,** Rittenhouse Decl. ¶ 7.)

8.      This was not the first contract Mr. Rittenhouse negotiated with Constellium on behalf of Faith. (**Exhibit B,** Rittenhouse Decl. ¶ 8.)

9.      In the past, Mr. Rittenhouse had represented Faith when it tolled scrap for Constellium's plant located in Muscle Shoals, Alabama. (**Exhibit B,** Rittenhouse Decl. ¶ 8.)

10.     In late May and/or early June 2023, through a series of e-mails and telephone conversations, Garey Rittenhouse and Shawn George agreed that Faith would toll at least 1.3 million pounds of scrap alloy for Constellium per month from June through December 2023. (**Exhibit B,** Rittenhouse Decl. ¶ 10.)

11.     Faith would charge Constellium $0.18 per pound for a total revenue of $1,638,000 in 2023. (**Exhibit B,** Rittenhouse Decl. ¶ 10.)

12.     Constellium was required either to deliver the required minimum volume of scrap or to pay Faith for that volume if it failed to deliver those minimums. In other words, it was a "take or pay" or "put or pay" agreement. (**Exhibit B,** Rittenhouse Decl. ¶ 10; *see also* **Exhibit A,** S. Stewart Dep. at 63:2-8

3

(explaining that "we needed a minimum monthly volume. We had been discussing that from the beginning. It was going to be that you ship this amount.").)

13.    Through his work with secondary toll convertors, Mr. Rittenhouse understands that Constellium has entered into other minimum volume contracts, also known as "take or pay" or "put or pay" contracts, with tolling companies like Faith. (**Exhibit B,** Rittenhouse Decl. ¶ 11.)

14.    In the "take or pay" or "put or pay" contracts Mr. Rittenhouse has negotiated, the buyer of the tolling capacity (in this case, Constellium) agrees to take a minimum amount of tolling capacity from the seller (here, Faith) regardless of whether the buyer intends to use it, subject to any rights of deferral that may be the in parties' agreement. (**Exhibit B,** Rittenhouse Decl. ¶ 12.)

15.    After Mr. Rittenhouse and Shawn George agreed on the terms of the parties' contract, Faith began tolling scrap for Constellium even though the parties had not yet signed a written document memorializing the terms of the agreement. (**Exhibit B,** Rittenhouse Decl. ¶ 13.)

16.    However, Mr. George assured Mr. Rittenhouse that a written contract document was forthcoming. (**Exhibit B,** Rittenhouse Decl. ¶ 13; **Exhibit A,** S. Stewart Dep. at 118:3-6.)

4

17.     Mr. George indicated to Mr. Rittenhouse that Mr. George was working on a written contract document with Mr. George's purchasing manager and Constellium's lawyer. (**Exhibit B,** Rittenhouse Decl. ¶ 14.)

18.     Although Mr. George never reversed course and indicated to Mr. Rittenhouse that Constellium did *not* intend to prepare a written contract, Mr. George never provided Mr. Rittenhouse with one in 2023 for the 2023 tolling work that Faith performed for Constellium. (**Exhibit B,** Rittenhouse Decl. ¶ 14; *see also* **Exhibit A,** S. Stewart Dep. at 101:14-21, 102:7-18.)

19.     Mr. George explained that "[g]etting a written contract at Constellium is a (sic) extensive process…It can sometimes take months and months." (**Exhibit C,** Deposition of Shawn George ("George Dep.") at 71:3-17.)

20.     Constellium's personnel also understood a formal contract was imminent. (**Exhibit C,** George Dep at 80:18-24 "[W]e were talking about Faith Aluminum and their contract as a whole all the time."); *id.* and Ex. 9 thereto **(Exhibit H)** ("[H]ave you moved further along w/ the other contract you spoke to me about w/ Faith Aluminum[?]); **Exhibit I,** Deposition of Jennifer Fife ("Fife Dep.") at 37:7-15 and Ex. 10 thereto **(Exhibit J)** ("Will have another contract coming through on the scrap side. Working a deal w/ Faith Aluminum.").)

21.     The parties proceeded with their business based on the terms Mr. Rittenhouse negotiated with Mr. George. (**Exhibit B,** Rittenhouse Decl. ¶ 15.)

4907-0345-6847.v2

22.     Constellium directed Faith to use a purchase order number while Constellium was purportedly working on the written contract. (**Exhibit B,** Rittenhouse Decl. ¶ 15; *see also* **Exhibit G,** Deposition of Kim Watson at 49:21-24 (testifying that Constellium "gave me a PO number. They would not give me an actual purchase order. I never received one until January of 2024").)

23.     Mr. George explained that, while awaiting a formal written contract, Constellium relied on purchase orders. (**Exhibit C,** George Dep. at 71:18-72:17.)

24.     However, Jennifer Fife, Constellium's then-Director of Procurement, testified that it was "not normal," "not standard operating procedure," and "not typical for Constellium to engage a vendor to perform tolling services without a formal written contract. (**Exhibit I,** Fife Dep. at 25:15-19; *id.* at 26:14-17; *id.* at 32:1-15.)

25.     Ms. Fife testified that, if Constellium needed a vendor to begin work immediately, the preferred approach was "to fast track the contract, putting resources to it, making it a priority." (**Exhibit I,** Fife Dep. at 26:14-17.)

26.     Ms. Fife confirmed that it was "not standard operating procedure to rely on purchase orders only." (**Exhibit I,** Fife Dep. at 26:14-17.)

27.     Ms. Fife said she would have expected Mr. George to be aware that Constellium preferred to have a written contract in place before a vendor processed scrap. (**Exhibit I,** Fife Dep. at 73:20-74:4.)

4907-0345-6847.v2

28.     Ms. Fife never spoke with Garey Rittenhouse, Steve Stewart, or any other Faith employee. (**Exhibit I,** Fife Dep. at 22:18-24:2.)

29.     Early on, it became evident that the volumes promised by Constellium were not materializing. (**Exhibit B,** Rittenhouse Decl. ¶ 16.)

30.     Although Constellium delivered roughly 1.5 million pounds in June 2023, its later deliveries repeatedly failed to meet its promised minimum of 1.3 million pounds per month. (**Exhibit B,** Rittenhouse Decl. ¶ 16.)

31.     Mr. George and Mr. Rittenhouse had weekly phone calls, which typically occurred on Friday, in which they reviewed and discussed the volumes that Constellium was sending to Faith for tolling. (**Exhibit B,** Rittenhouse Decl. ¶ 16.)

32.     As each month closed, the shortfalls in Constellium's volumes became a topic of discussion. (**Exhibit B,** Rittenhouse Decl. ¶ 17.)

33.     Mr. George would provide forecasts of what Constellium would be sending to Faith in the following month. (**Exhibit B,** Rittenhouse Decl. ¶ 17.)

34.     During those conversations, Mr. George would frequently tell Mr. Rittenhouse that Constellium would make up for the prior month's deficiencies during the next month. (**Exhibit B,** Rittenhouse Decl. ¶ 17.)

35.     Mr. Rittenhouse and Mr. George also discussed that the parties would reconcile any shortfall every 90 days. (**Exhibit B,** Rittenhouse Decl. ¶ 17; *see also*

7

**Exhibit A,** S. Stewart Dep. at 82:7—83:1 (testifying that "we would settle it up at 90 days…[t]o make up for the shortfall of the three-month period".).)

36.    Despite the parties' agreement that Constellium would deliver 9,100,000 pounds of scrap alloy through the end of 2023, Constellium delivered only 6,463,267 pounds of scrap alloy. (**Exhibit B,** Rittenhouse Decl. ¶ 18.)

37.    This resulted in a shortfall of 2,636,733 pounds of scrap alloy for a total of $474,611.94 at the agreed-upon rate of $0.18 per pound. (**Exhibit B,** Rittenhouse Decl. ¶ 19.)

38.    By December 2023, Faith had been processing scrap for Constellium for nearly 6 months, but Constellium had still not delivered the written contract it had promised, nor had it paid Faith for the substantial revenue deficit resulting from its delivery shortfalls. (**Exhibit B,** Rittenhouse Decl. ¶ 20; *see also* **Exhibit A.,** S. Stewart Dep. at 102:7-18; *id.* at 104:1-107:13.)

39.    When asked why Constellium never provided a formal written contract in 2023, Mr. George explained that, "before that could be done, we began to have issues with Faith about volumes and things of that nature." (**Exhibit C,** George Dep. at 73:8-15.)

**C.    The Resolution of the 2023 Shortfall and the Agreement for 2024**

40.    By December 2023, Mr. Stewart testified that Constellium "had not shipped what they said they were going to ship prior to that date, and I didn't

8

want it coming in all right before Christmas before we were going to be out of the plant for two weeks." (**Exhibit A,** S. Stewart Dep. at 98:9-13.)

41.     At that same time Mr. Stewart said that Faith and Constellium were engaged in an ongoing discussion about how Constellium would pay for the 2023 shortfall. (**Exhibit A,** S. Stewart Dep. at 85:21-86:5 (That was an ongoing negotiation supposed to pay, not paying, what are you going to do, you know, you need to pay us.").)

42.     On December 12, 2023, Mr. Rittenhouse sent Mr. George an e-mail expressing his concerns and the future viability of Faith's ability to continue processing scrap for Constellium. (**Exhibit B,** Rittenhouse Decl. ¶ 21 and Ex. 1 thereto.)[2]

43.     For the entire time Constellium had been shipping scrap alloy to Faith for processing, Constellium had been Faith's only active tolling customer. (**Exhibit B,** Rittenhouse Decl. ¶ 21.)

44.     The revenues Faith generated by processing only the volume of scrap Constellium had delivered—rather than the volume of scrap it had promised to

---

[2]     Due to time zone differences, Mr. Rittenhouse's December 12 and 13, 2023 e-mails appear on some versions as December 13 and 14, depending on the party that produced the document. For the sake of consistency, Faith will match Constellium's format (*i.e.,* December 12 and 13.) Note that deposition transcripts and exhibits may refer to those e-mails as having been sent on December 13 and 14.

deliver—were insufficient to allow Faith to operate profitably. (**Exhibit B,** Rittenhouse Decl. ¶ 21.)

45.    In his December 12, 2023 e-mail, Mr. Rittenhouse identified three critical aspects of the parties' business relationship that required a collective resolution: (1)  the 2023 gap between actual and promised tolling volumes, (2) the need to agree on future minimum tolling volumes and rates for 2024, and (3) the creation of a formal, written tolling agreement for 2024, which Constellium had promised in 2023 but had never provided. (**Exhibit B,** Rittenhouse Decl. ¶ 21 and Ex. 1 thereto.)

46.    Following a telephone call with Mr. George on or about December 13, 2023, Mr. Rittenhouse memorialized the proposed parameters of the parties' business relationship for 2024 by e-mail. (**Exhibit B,** Rittenhouse Decl. ¶ 22 and Ex. 2 thereto.)[3]

47.    As set forth in Mr. Rittenhouse's December 13, 2023 e-mail, Faith proposed (a) a contract period running from January through December 2024, (b) a minimum monthly scrap volume of 1,000,000 pounds, (c) a base tolling rate of $0.20 per pound for the minimum 1,000,000 pounds of scrap alloy per month, (d) a base tolling rate of $0.17 per pound for all volume in excess of 1,000,000 pounds of scrap alloy per month, and (e) an additional charge of $0.0931 per pound for the first

---

[3]    *See* n.2, *supra.*

1,000,000 pounds of scrap per month during the 4-month period from January through April 2024 to compensate Faith for the 2023 volume shortfall and resulting tolling fees, which Faith agreed to discount by 30% to secure an agreeable payment plan. (**Exhibit B,** Rittenhouse Decl. ¶ 23 and Ex. 2 thereto; *see also* **Exhibit C,** George Dep. at 147:8-155:11 and Ex. 17 thereto **(Exhibit D)**.)

48.    In other words, for the months of January through April 2024, Faith proposed a total tolling rate of $0.2931 per pound for the first 1,000,000 pounds of scrap alloy each month. Of that total rate, $0.0931 per pound would constitute a "make-up" payment for the 2023 shortfall, which shortfall, again, Faith proposed to discount by 30% to secure an agreeable payment plan. (**Exhibit B,** Rittenhouse Decl. ¶ 24 and Ex. 2 thereto; *see also* **Exhibit C,** George Dep. at 147:8-155:11 and Ex. 17 thereto **(Exhibit D)**.)

49.    Shawn George never communicated to Garey Rittenhouse, either in writing or over the telephone, that he disagreed with the calculations or analysis set forth in Mr. Rittenhouse's December 13, 2023 e-mail. (**Exhibit B,** Rittenhouse Decl. ¶ 24.)

50.    Mr. George never sent any written response challenging the assertions in the December 13, 2023 e-mail. (**Exhibit C,** George Dep. at 155:12-156:25 ("[W]hen I did respond to him in e-mail, I didn't address that

conversation."); *id.* at 242:3-243:12 (confirming he never disputed the December 13, 2023 e-mail in writing).)

51.     Constellium agreed to Faith's proposal for addressing the 2023 volume and tolling fee shortfall. (**Exhibit B,** Rittenhouse Decl. ¶ 25.)

### D.     The 2024 Purchase Order and Constellium's Failure to Perform

52.     In a January 9, 2024 e-mail, Mr. George stated that he was delivering a purchase order "to encompass January through April at the $.2931/lb. rate we previously discussed." (**Exhibit B,** Rittenhouse Decl. ¶ 25 and Ex. 3 thereto.)

53.     Mr. George also assured Mr. Rittenhouse that he was still working on the formal contract for 2024. (**Exhibit B,** Rittenhouse Decl. ¶ 25 and Ex. 3 thereto; **Exhibit C,** George Dep. at 158:18-159:1 and Ex. 18 thereto **(Exhibit E)** ("I am still working on the formal contract for 2024.").).)

54.     Attached to Mr. George's January 9, 2024, e-mail, Constellium issued Purchase Order No. 4500392846 (the "2024 Purchase Order"), which provided that the "Qty Ordered" was 1,000,000 pounds for the months of January through April 2024, and the rate was "$.2931/lb." (**Exhibit B,** Rittenhouse Decl. ¶ 26 and Ex. 3 thereto.)

55.     Constellium expected Faith to honor the terms of the 2024 Purchase Order. (**Exhibit C,** George Dep. at 238:10-17 (responding that, when asked if

Constellium expected Faith to process between 700,000 and 1.5 million pounds of scrap for Constellium on an ongoing bases, "I sure hope so, we did a deal").)

56.    In January 2024, Constellium delivered only 356,320 pounds of scrap—a shortfall of 643,680 pounds from the 1,000,000 pounds reflected in the Purchase Order. (**Exhibit B,** Rittenhouse Decl. ¶ 28.)

57.    In January 2024, Faith sent Constellium an invoice for the amounts reflected in the 2024 Purchase Order, but Constellium did not pay the invoice. (**Exhibit A,** S. Stewart Dep. at 117:19-21 ("We sent an invoice to see if they were going to pay it, and they would not agree to pay it based on the January PO.").)

58.    In an effort to obtain payment and avoid further losses, Mr. Stewart and Mr. Rittenhouse began brainstorming about how they might address Constellium's failure to honor its terms. (**Exhibit B,** Rittenhouse Decl. ¶ 29.)

59.    One such suggestion was a modification to the agreed-upon 2024 tolling rate and crediting "Monthly toll fees greater than $200k…to the settlement balance" of approximately $372k. (**Exhibit B,** Rittenhouse Decl. ¶ 29 and Ex. 4 thereto.)

60.    Mr. Rittenhouse did not view Faith's willingness to consider such a modification to mean that the 2024 Purchase Order was invalid. (**Exhibit B,** Rittenhouse Decl. ¶ 29.)

### E.    Faith Ceases Operations

61.    Because Constellium had failed to fulfill its contractual obligations, Faith decided not to accept additional shipments from Constellium and to cease operations altogether, as Constellium was its only customer from May 2023 through its closing. (**Exhibit B,** Rittenhouse Decl. ¶ 30.)

62.    Constellium's failure to deliver the minimum volume of scrap it had promised to deliver resulted in Faith's inability to operate its business profitably. (**Exhibit B,** Rittenhouse Decl. ¶ 30; *see also* **Exhibit A,** S. Stewart Dep. at 120:10-20 (explaining that Faith "couldn't continue running the plant at a loss").)

63.    With respect to Faith's cessation of operations and sale of its assets, Mr. Stewart testified that, had Constellium delivered the volume of scrap it had promised, he would not have sold the business. (**Exhibit A,** S. Stewart Dep. at 154:23-155:4 ("If [Constellium] had honored their end of the contract that we were in, I never would have attempted to sell it.").)

### F.    Garey Rittenhouse's Commissions and Authority

64.    With respect to the commissions Faith paid to Mr. Rittenhouse for the scrap Faith processed for Constellium, Mr. Stewart testified that Mr. Rittenhouse "would not have submitted an invoice [for his commissions] until we got paid for it." (**Exhibit A,** S. Stewart Dep. at 53:6-12.)

4907-0345-6847.v2

65.     When asked if he would pay Mr. Rittenhouse "for his commissions for the shortfall if you get paid for it," Mr. Stewart stated: "Yes, I will. I honor my agreements." (**Exhibit A,** S. Stewart Dep. at 53:6-12.)

66.     At all times during that period, Constellium never once questioned or disputed whether Mr. Rittenhouse was authorized to speak on behalf of Faith. (**Exhibit B,** Rittenhouse Decl. ¶ 8.)

67.     Similarly, at all times during Mr. Rittenhouse's interactions with Mr. George, Mr. George never once inquired about or questioned whether Mr. Rittenhouse was authorized to speak or negotiate on behalf of Faith. (**Exhibit B,** Rittenhouse Decl. ¶ 9.)

68.     Shawn George understood that Mr. Rittenhouse had the authority to act on Faith's behalf. (**Exhibit C,** George Dep. at 66:8-17 and Ex. 6 thereto **(Exhibit K)**. ("Garey is with Faith Aluminum and we work as a team on this project."); *id.* at Ex. 4 thereto **(Exhibit L)** ("I have gone back to Garey at Faith one more time to get a better fee."); *id.* at Ex. 7 thereto **(Exhibit M)**. ("I have spoken to Garey at Faith Aluminum regarding our upcoming physical inventory.").)

**G.    Faith's Purchase of Equipment to Toll Constellium's Scrap**

69.     Faith purchased equipment to process the Constellium's scrap. (**Exhibit A,** S. Stewart Dep. at 156:9-158:23 (confirming that "Faith purchased approximately $1.1 million in necessary equipment and made other investments

to fulfill its contractual obligations to Constellium, including a Wolf shredder and a Bivitek screen," which enabled Faith to increase its production, lower its cost, and produce a fully clean product.).)

70.    Faith advised Constellium that it had purchased new equipment. (*See* **Exhibit C,** George Dep. at 191:14-19 and Ex. 20 thereto **(Exhibit N)** (advising Mr. George that "we will be installing some new equipment into the production line").)

71.    Mr. George understood that, in the tolling business, machinery parts wear out and need to be replaced. (**Exhibit C,** George Dep. at 192:20-24 (acknowledging that tolling scrap was "somewhat of a self-destructive process, the equipment wears out.").)

*[Signature appears on following page.]*

16

June 20, 2025.[4]

ARNALL GOLDEN GREGORY LLP

*/s/ C. Knox Withers*

C. Knox Withers
Georgia Bar No. 142482
Morgan E. M. Harrison
Georgia Bar No. 470983
Avery E. Carter
Georgia Bar No. 443820

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
404-873-8129
knox.withers@agg.com
morgan.harrison@agg.com
avery.carter@agg.com

*Attorneys for Plaintiff Faith*
*Aluminum Company*

---

[4]    The undersigned counsel certifies that this document has been prepared in Book Antiqua font (13 point).

17

**Certificate of Service**

I certify that, on this date, I served Defendant with a copy of the foregoing **Plaintiff's Response to Defendant's Statement of Undisputed Material Facts** by electronic filing, which will cause a copy to be delivered to Defendant's attorney of record addressed to:

John J. Meadows
Steptoe & Johnson PLLC
707 Virginia Street E.
Suite 1700
Charleston, West Virginia 25301

June 20, 2025.

Arnall Golden Gregory LLP

/s/ C. Knox Withers
C. Knox Withers
Georgia Bar No. 142482
Morgan E. M. Harrison
Georgia Bar No. 470983
Avery E. Carter
Georgia Bar No. 443820

171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
404-873-8129
knox.withers@agg.com
morgan.harrison@agg.com
avery.carter@agg.com

*Attorneys for Plaintiff Faith Aluminum Company*

18

4907-0345-6847.v2